**PEABODY COAL COMPANY,**
**Appellant (Plaintiff below),**

v.

**James M. RIDENOUR, Director Department of Natural Resources and Indiana Natural Resources Commission, Appellees (Defendants below).**

No. 67A01–8706–CV–131.

Court of Appeals of Indiana,
First District.

Dec. 10, 1987.

David R. Joest, Evansville, for appellant.

Linley E. Pearson, Atty. Gen., Myra P. Spicker, Deputy Atty. Gen., Indianapolis, for appellees.

ROBERTSON, Judge.

Appellant-plaintiff Peabody Coal Co. (Peabody) appeals from the judgment of the trial court finding that Peabody needed a permit from appellee-defendant Department of Natural Resources (Department) in order to move a dragline between two permitted sites.

We affirm.

In May, 1985 Peabody moved its 8900 Marion dragline [1] and other mining equipment from its closed Dugger mine to its Hawthorn mine, at which Peabody would mine the surface for coal. Both Dugger and Hawthorn mines are covered by surface coal mining and reclamation permits under IND. CODE 13–4.1. The area in between these mines along which the equipment was "walked" was approximately ten miles long and about 200 feet wide. About five miles of the walkway was covered under the permits for the Dugger or Hawthorn mines. The walkway abutted the Dugger mine on one end and the Hawthorn mine at the other end. The dragline was not taken over existing roads, but was walked across fields belonging either to Peabody, to Peabody's lessor, or to one other landowner who granted Peabody a right-of-way. During the dragline move, Peabody levelled the ground by cutting into the earth and filling depressions in the surface; wet material was removed where it could not safely bear the machine's weight. It would take 12 months to restore the land to its original condition. The walkway existed only to enable the dragline to gain access to the Hawthorn site for mining activities.

Before moving its dragline, Peabody requested a ruling from the Department whether it would require that Peabody have a permit for the "walkway" route before it could move its dragline. The Department decided that a permit would be required. Peabody applied for and received the required permit under protest and the move took place over a period of about three weeks. Peabody pursued its administrative remedies nevertheless, and an administrative law judge submitted proposed findings and a recommended order against Peabody, which the Natural Resources Commission (Commission) adopted.

Peabody sought judicial review, and the trial court rendered findings of fact and conclusions of law adverse to Peabody.

The trial court concluded that the dragline walkway was adjacent to land the use of which was incidental to mining activities. Consequently, "creation and use of the coal mining equipment walkway constituted a 'surface coal mining operation' within the meaning of I.C. 13–4.1–1–3(12)," thereby requiring that Peabody obtain a permit and post a reclamation bond in order to move its mining equipment. This appeal ensued.

The sole issue presented in this appeal is whether the movement of the dragline and other mining equipment from a closed surface coal mine to another mining location at which the equipment will be used to mine coal, is within the definition of "surface coal mining operations" found at I.C. 13–4.1–1–3(12).

---

1. Appellant's brief indicates that the Marion 8900 dragline is one of the largest draglines in the world. Appellant's brief, p. 37.

We are not aided by past authority on the subject since we have been unable to find any appellate decisions interpreting the phrase. Accordingly, we rely upon well-established rules of statutory construction. In construing a statute, if the language is clear and unambiguous it need not and cannot be subject to judicial interpretation. It is a court's duty to give effect to the plain and ordinary meaning of words used in a statute. *Ind. Department of State Revenue, Inheritance Tax Division v. Estate of Smith* (1984), Ind.App., 460 N.E.2d 1263. The statute should be construed so as to ascertain and give effect to the intentions of the legislature expressed in the statute. *B & M Coal Corporation v. United Mine Workers of America* (1986), Ind., 501 N.E.2d 401, *cert. denied,* — U.S. ——, 107 S.Ct. 2183, 95 L.Ed.2d 839.

"No person may open, develop or operate a new or previously mined or abandoned site for surface coal mining operations ... without first holding a valid surface coal mining and reclamation permit." I.C. 13-4.1-3-1.

(12) "Surface coal mining operations" means: (A) Activities conducted on the surface of lands in connection with a surface coal mine or subject to the requirements of IC 13-4.1-9 surface operations and surface impacts incident to an underground coal mine, the products of which enter commerce or the operations of which directly or indirectly affect interstate commerce. These activities include excavation for the purpose of obtaining coal including such common methods as contour, strip, auger, hilltop removal, boxcut, open pit, and area mining, the use of explosives and blasting, and in situ distillation or retorting, leaching or other chemical or physical processing, and the cleaning, concentrating, or other processing or preparation, loading of coal for interstate commerce at or near the mine site. However, these activities do not include the extraction of coal incidental to the extraction of other minerals where coal does not exceed sixteen and two-thirds percent (16⅔%) of the tonnage of minerals removed for purposes of commercial use or sale or coal explorations subject to IC 13-4.1-7.

(B) The areas upon which mining activities occur or where mining activities disturb the natural land surface. *Those areas also include any adjacent land the use of which is incidental to any mining activities,* all lands affected by the construction of new roads or the improvement or use of existing roads to gain access to the site of mining activities and for haulage, and excavations, workings, impoundments, dams, ventilation shafts, entryways, refuse banks, dumps, stockpiles, overburden piles, spoil banks, culm banks, tailings, holes or depressions, repair areas, storage areas, processing areas, shipping areas and other areas upon which are sited structures, facilities, or other property or materials on the surface, resulting from or incident to mining activities. (Emphasis supplied.)

IC 13-4.1-1-3.

Subsection A describes activities which constitute surface coal mining operations; subsection B describes areas upon which those mining activities occur or where those activities disturb the natural land surface. The Commission ruled that Peabody's creation and use of the walkway to move its dragline from one surface mining site to another fell within the phrase "adjacent land the use of which is incidental to any mining activities." The trial court so held, and we agree.

The points of contention of the parties to this dispute are the meanings of the words "adjacent" and "incidental." There are no definitions of either word supplied by statute or regulation, except for the term "adjacent area" found at 310 I.A.C. 12-1-3. However, we do not deem that definition helpful or persuasive, because part of the definition of "adjacent area" is the phrase "adversely impacted by surface coal mining and reclamation operations"— nearly the term we must construe in the first place. We are left with determining the meanings of "adjacent" and "incidental" as they are used in ordinary English usage. "Adjacent" means not distant; nearby; having a common endpoint or border. *Webster's Ninth New Collegiate Dic-*

*tionary* (1985). From this definition we may easily infer that the walkway was adjacent to the closed Dugger mine and to the Hawthorn mine, since the walkway abutted each mine at one end. Peabody protests that the walkway is not adjacent to either mine because, of its total area, only a small portion actually abutted the mines. There is no indication in the definition of "adjacent" that a certain proportion of an area must abut the second area; Peabody acknowledges that land may be adjacent even though it does not come into contact with the other area.

▪ "Incidental" means "being likely to ensue as a chance or minor consequence," *id;* something necessary, appertaining to, or depending upon another which is termed the principal. *Black's Law Dictionary* 38 (5th ed. 1979). The trial court found, and Peabody does not dispute, that the dragline movement was undertaken solely for the purpose of making surface coal mining possible. Moving the dragline along the walkway was incidental to the extraction of coal to be undertaken at Peabody's Hawthorn mine. We are not persuaded that the moving of the dragline along a walkway had to be a normal or usual consequence of mining activity in order to be termed "incidental."

▪ Moreover, read as a whole, subparagraphs (A) and (B) of I.C. 13–4.1–1–3 include the moving of the dragline which disturbed the natural land surface over which it passed. Although there is no binding authority construing surface coal mining activities, we are persuaded that moving the dragline requires a permit by the decision in *Amax Coal Co., Inc. v. Illinois Department of Mines and Minerals, Land Reclamation Division,* N.O.V. 12–5–82 (Jan. 13, 1983), in which the hearing officer considered the definition of "surface coal mining activities" nearly identical to Indiana's. In that case, a Marion 8750 dragline was in transit between fields at the Sun Spot mine, on a deadhead route permitted for that purpose, when it passed by private property adjacent to the mine. As it passed the property, the weight of the dragline caused the surface of the private property to buckle, creating a mound. The hearing officer concluded that "surface

coal mining operations" included situations where the natural land surface outside a permitted area is disturbed by activities conducted *inside* a permitted area. *Id.,* slip op. at 125. In the instant case, the disturbance to the natural land surface resulted from activities occurring *outside* a permitted area, making the result in this case even more compelling than that in *Amax.*

Finally, Peabody asserts that the dragline move should not fall within the definition of "surface coal mining operations" because our present law was enacted only because the federal government mandated greater regulation in the area, *see* I.C. 13–4.1–1–1(1); hence, we should apply the less stringent requirements of our prior law which would not have required a permit for the dragline move. Peabody seems to be arguing that we should determine legislative intent by examining the legislative findings contained at I.C. 13–4.1–1–1 in which the General Assembly condemned what it perceived as federal encroachment on state regulation of the coal mining industry. Regardless of what the General Assembly's motivations were in enacting our present law, there are no expressions of legislative intent in section 1. Rather, legislative intent is more apparent in section 2 entitled "Purpose of Article." Without setting out the entire section, we note that subparagraph (3) is especially appropriate to this case: "It is the purpose of this article to: (3) Assure that the rights of surface landowners and other persons with a legal interest in the land or appurtenances thereto are fully protected from surface coal mining operations."

Nevertheless, we need not determine legislative intent, because the definition of "surface coal mining operations" as applied to the dragline move is clear and unambiguous.

Judgment affirmed.

RATLIFF, C.J., and NEAL, J., concur.