Mary Kay REVORD, By Her Father and Next Friend, Paul H. Revord, Plaintiff-Appellant,

v.

John R. RUSSELL, M.D., Defendant-Appellee.

No. 2–877A305.

Court of Appeals of Indiana, Fourth District.

March 26, 1980.

Thomas E. Alsip, Indianapolis, for plaintiff-appellant.

John P. Price, Jon D. Krahulik, Bingham, Summers, Welsh & Spilman, Indianapolis, for defendant-appellee.

MILLER, Presiding Judge.

Plaintiff Appellant Mary Kay Revord, by her father and next friend, Paul Revord, instituted this suit against Dr. John Russell on a theory of medical malpractice, alleging Dr. Russell breached his duty by failing to inform the Revords of the risks involved in surgery and such failure was the proximate cause of Mary's injury. The Revords bring this appeal from the trial court's removal of the case from the jury after sustaining Russell's motion for judgment on the evidence.

We affirm.

In 1965 Mary Kay Revord, then age 2½, was operated on by Dr. Sayers at the Ohio State Medical Center to remove a tumor in her cerebellum. Not all of the tumor was removed by the surgery or subsequent cobalt treatments. Nonetheless, Mary progressed well and after eight years had only minor impairments. On September 6, 1973 immediately after Mary's family moved to Indiana, she was brought to defendant Dr. John Russell, a neurosurgeon, for an exami-

nation. He took her medical history, received records from Dr. Sayers and performed a neurological examination. Tests run at Methodist Hospital in Indianapolis confirmed his belief in the recurrence of her brain tumor. Surgery was performed on September 25, 1973. Russell re-opened Mary's skull and re-drained the tumor, it being too large to remove. However, during the closing Mary's heart stopped. Even though she was resuscitated within 20 to 45 seconds she never recovered consciousness and remained comatose at the time of the trial four years later.

Dr. Russell, called as a witness by the Revords, testified he believed he talked with Mary's parents about removing or draining the tumor in surgery, such technique being essentially the same as employed earlier by Dr. Sayers. At trial he was not sure of what the exact substance of the conversation had been (since the parents had already been through a similar operation he admits he may not have gone deeply into an explanation) but believed he would have told them that:

1. Mary had a recurrent tumor.
2. The tumor could either be solid or cystic.
3. Cystic tumors have a better prognosis.
4. The tumor could not be removed in its entirety since Dr. Sayers observed it growing into the brain stem.
5. If the tumor were cystic, he would evacuate the liquid contents of the cyst and relieve pressure on the brain; and if it were solid, he would remove as much as possible and avoid damage to the brain as much as possible.
6. Mary's eight year survival period after the first operation was a good indication that she might have a lengthy survival period after this second operation.
7. He would operate in the back part of the head where the surgery had been done before; he would go in and expose the tumor.

Russell testified he saw no alternative to surgery for Mary. He testified he performed substantially the same operation as performed by Dr. Sayers and any other neurosurgeon including Dr. Sayers would have performed the present operation in a similar manner. Russell also stated he did not recall ever seeing or hearing of a patient who reacted as Mary did to this type of surgery. No other medical expert testified at the trial.

Mary's parents testified they were not informed before the surgery of any possible risks Mary might incur in submitting to the operation. However, they testified they had acquainted themselves with Mary's illness over the years and knew the surgery to be performed was substantially the same operative procedure employed in Mary's first operation. Further, they knew the procedure was serious and, as in all surgery, there existed a risk of death.

The court at the close of Revords' evidence entered judgment for Russell as follows:

At the close of the Plaintiff's evidence, the Defendant has moved for judgment on the evidence.

The Plaintiff does not contend, nor was evidence introduced that the Defendant was guilty of negligence in the performance of the operation on September 25, 1973.

The only issue is whether the Defendant was negligent in failing to adequately inform the Plaintiffs of the nature and danger of their daughter's surgery. . . . .

There is no need for a physician to disclose risks that are likely to be known by the average patient or that are in fact known to particular patients because of past experiences with the condition. In this case, the Plaintiffs were aware of the type of surgery and the general dangers involved. They were aware that without the surgery their daughter had little chance for life. To demand of the surgeon that he explore with the parents every adverse possibility of an operation, including one unknown to the experience

of the surgeon, himself, demands unreasonably that the surgeon be able to predict or guarantee results.

The Revords contend the trial court erred since conflicting evidence existed as to the content of the conversations between Dr. Russell and Mary's parents concerning the disclosure of the risks of surgery. The Revords go no further with the argument than to note the conflict. Although we acknowledge the existence of such conflict, a judgment on the evidence is proper "if there is not substantial evidence or reasonable inference to be adduced therefrom to support an essential element of the claim." *Huff v. Traveler's Indemnity Co., Inc.* (1977) 266 Ind. 414, 363 N.E.2d 985, 990; Ind.Rules of Procedure, Trial Rule 50. We hold the Revords' evidence lacks two essential elements necessary to make a prima facie case: (1) there was no expert evidence to establish what risks Russell had a duty to disclose, and (2) there was no evidence of proximate cause.

■ An action prefaced on the doctrine of informed consent is now considered as one based on negligence, not battery, an intentional tort, *see Natanson v. Kline* (1960) 186 Kan. 393, 350 P.2d 1093, *modified*, 187 Kan. 186, 354 P.2d 670; *Prosser, Torts* (4th ed. 1971) 165, 166. Thus, as in any negligence case a plaintiff must show a duty owed to him and a breach of that duty (by falling below the set standard of care) which proximately causes a compensable injury. *Petroski v. Northern Indiana Public Service Co.* (1976) Ind.App., 354 N.E.2d 736, 741; 21 I.L.E. *Negligence* § 2, p. 262.

The duty owed the Revords by Russell is established in the area of informed consent as a matter of law.

It is clear that Indiana must recognize the duty of a physician to make a reasonable disclosure of material facts relevant to the decision which the patient is requested to make. *Natanson, supra*; *Bang v. Charles T. Miller Hospital* (1958) 251 Minn. 427, 88 N.W.2d 186; *Cobbs v. Grant* (1972) 8 Cal.3d 229, 104 Cal.Rptr.

505, 502 P.2d 1. The duty arises from the relationship between the doctor and patient and is imposed as a matter of law, as are most legal duties. *Miller v. Griesel, et al.* (1974), 261 Ind. 604, 308 N.E.2d 701.

*Joy v. Chaw* (1978) Ind.App., 377 N.E.2d 670, 676–77.

### Standard of Care

The standard by which Russell's actions were to be judged is also pre-determined. To fulfill his duties, Russell was obligated to make "a reasonable disclosure of material facts relevant to the [Revords'] decision." *Id.* at 676. As described in *Cobbs v. Grant, supra*, 502 P.2d at 11:

[T]he patient's right of self decision is the measure of the physician's duty to reveal. That right can be effectively exercised only if the patient possesses adequate information to enable an intelligent choice. The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is whatever information is material to the decision. Thus the test for determining whether a potential peril must be divulged is its materiality to the patient's decision. *Canterbury v. Spence* (C.A.D.C. 1972) 464 F.2d 772, 786.

■ The general rule is that expert medical testimony is required to establish the content of such "reasonable disclosure" unless the situation is clearly within the realm of laymen's comprehension as where the disclosure is so obvious that laymen could recognize the necessity of such disclosure. Annot., 52 A.L.R.3d 1084 (1973).

There are obviously important roles for medical testimony in such cases, and some roles which only medical evidence can fill. Experts are ordinarily indispensable to identify and elucidate for the fact finder the risks of therapy and the consequences of leaving existing maladies untreated. . . . Save for relative infrequent instances where questions of this type are resolvable wholly within the realm of or-

dinary human knowledge and experience, the need for the expert is clear. *Canterbury v. Spence*, supra at 791–92.

█ In the instant case the Revords offered no expert medical testimony,[1] and laymen would have no way of determining whether under the circumstances Mary Revord's parents had sufficient information to allow them to make an intelligent decision. Brain surgery is not a matter within the common knowledge or experience of laymen, and we hold that medical testimony was required of the Revords to establish a prima facie case under their informed consent theory. No expert medical evidence was offered by the Revords that a reasonable neurosurgeon, in the same or similar circumstances, would have told them of the risk of injury suffered here or that the disclosures made by Russell did not meet the standard of what a reasonable neurosurgeon would have disclosed under the same or similar circumstances. *Green v. Hussey* (1970) 127 Ill.App.2d 174, 262 N.E.2d 156 (x-ray and cobalt treatments); *Rea v. Gaulke* (1969, Tex.Civ.App.) 442 S.W.2d 826 (hernia operation); *Aiken v. Clary* (1965, Mo.) 396 S.W.2d 668 (insulin shock therapy); Annot., 52 A.L.R.3d 1084, *supra.* Thus the trial court properly granted a directed verdict in Russell's favor.

*Proximate cause*

█ Proximate cause is also a necessary element in any tort case. 21 I.L.E., *Negligence* § 2. There is no proximate cause if the plaintiff would have submitted to the treatment even if a full disclosure had been made. *Natanson v. Kline, supra.*

There must be a causal relationship between the physician's failure to inform and the injury to the plaintiff. Such causal connection arises only if it is established that had revelation been made consent to treatment would not have been given.

*Cobbs v. Grant, supra*, 502 P.2d at 11.

█ In the instant case the Revords testified not that they would have foregone treatment had they known of the fatal risk, but that they would have chosen a different doctor. The Revords did not allege or prove any negligence on Russell's part during surgery. This situation differs only slightly from one in which the plaintiff with 20/20 hindsight claims, if informed, he would have declined treatment. In either situation "we doubt that justice would be served by placing the physician in jeopardy of one patient's bitterness and disillusionment". *Cobbs v. Grant, supra,* 502 P.2d at 11. The issue in informed consent is whether the patient was subjected to the inherent risks of the proposed treatment without being permitted to intelligently reject or accept treatment; the collateral issue of individual negligence is not alleged here. Thus, there was also insufficient evidence on the issue of proximate cause to allow the plaintiff's case to reach the jury.

█ In conclusion, we note Revords' evidence failed to show that even if Russell had made a full disclosure the risk of the injury actually suffered (heart stoppage and resulting coma) would have been among the risks disclosed. The uncontradicted testimony of Russell was that such near-fatal risk was not known to him. Russell cannot be held liable for failure to disclose risks of which he did not know and had no duty to know.

[I]t is impossible to disclose something of which one is unaware. This point is not made in the cases because informed consent cases have involved collateral risks attaching to widely-used therapies; thus the courts have probably been correct in assuming that the physician-defendants actually knew of them. If a risk is not actually known to one physician, however, it is inappropriate to speak solely of a duty to disclose.

Walt & Scheuneman, *Informed Consent to Therapy*, 64 N.W.V.L.Rev. 628, 631 (1970).

The judgment of the trial court is affirmed.

YOUNG and CHIPMAN, JJ., concur.

---

1. Granted Dr. Russell was called as an expert in Revord's case. However, he did *not* testify to the extent of disclosure necessary under the circumstances to allow the Revords to make an intelligent decision on treatment of their daughter.