**Carol JONES, as Personal Representative of the Estate of Jon W. Jones, Deceased, Plaintiff,**

**v.**

**Harold W. GRIFFITH, M.D., Defendant.**

**Civ. No. F 88–10.**

United States District Court, N.D. Indiana, Fort Wayne Division.

June 14, 1988.

Daniel A. Roby, G. Stanley Hood and Kathryn G. Roudebush, Roby & Hood, Fort Wayne, Ind., for plaintiff.

John W. Clifton, Barrett & McNagny, Fort Wayne, Ind., for defendant.

Alfred K.B. Tsang, Deputy Atty. Gen., Indianapolis, Ind., for Indiana Ins. Comr.

John W. Whiteleather, Jr., Columbia City, Ind., for Panel Chairman.

## ORDER

WILLIAM C. LEE, District Judge.

The plaintiff, Carol Jones, has filed a motion for a preliminary determination under I.C. 16–9.5–10–1 which presents a number of important issues under Indiana law. Defendant Griffith has filed a motion to dismiss this action under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Both motions are fully briefed and the court heard oral argument

on May 23, 1988.[1] To expedite matters, the court will deal both with the defendant's motion to dismiss and the plaintiff's motion for a preliminary determination in this order.

## I.

### Factual Background

For purposes of these motions, the important facts are undisputed. On June 27, 1985, plaintiff's decedent, Jon W. Jones, a 44 year old white male police officer, entered Parkview Memorial Hospital in Fort Wayne, Indiana, for a diagnostic outpatient angiogram prescribed by his physician, Dr. David Sowden. Mr. Jones was experiencing pain and weakness in his lower extremities and Dr. Sowden suspected claudication.

Upon admission, Mr. Jones signed a consent form and was taken to the radiology department. A technician employed by Parkview Hospital, but working exclusively for the radiology department, explained the procedure to Mr. Jones, but did not tell him about any of the risks of the procedure, and more specifically did not tell him that death was a risk.

Mr. Jones was then medicated and an intravenous line was established to keep a vein open should it become necessary to instill intravenous medication. A catheter was also inserted into Mr. Jones' groin area and was used by defendant, Harold M. Griffith, M.D., a board certified radiologist, to infuse the contrast media into the patient's vascular system.

The femoral angiographic procedure was carried out uneventfully and the findings indicated that Mr. Jones could have been treated chemically and that surgery was unnecessary. However, while the films were being developed the patient became flushed, nauseous, and began sweating. After attempting to vomit, the patient appeared slightly improved. Due to Mr. Jones' appearance, benadryl and adrenalin were drawn up. The patient seemed to improve for a very short time, but then became nauseated and lost consciousness. Adrenalin was administered and CPR was immediately started, and was carried on for over an hour with the help of anesthesiologists, internists and cardiologists. Despite all efforts, Mr. Jones died.

Epinephrine is a form of adrenalin which is used to resuscitate patients who have anaphylactic reactions to angiographic dye contrast material. It can be administered subcutaneously (under the first layer of skin), intramuscularly (in the deltoid or shoulder muscle), intravenously (into a patent I.V. line) and intracardiac (into the heart muscle). On the day of Mr. Jones' angiographic procedure, an emergency crash cart was available in the radiology department, with drugs stocked at the request of the radiologists, including defendant Griffith. However, only intramuscular and subcutaneous epinephrine were available on the radiological crash cart. Intravenous epinephrine was available on the Code Blue cart outside the radiological theater.

The plaintiff contends that defendant Griffith's failure to administer epinephrine intravenously was negligent. Defendant Griffith, while he was apparently responsible to see that the crash cart was equipped with resuscitative epinephrine, contends that Mr. Jones would not have survived even if the epinephrine would have been administered intravenously. The plaintiff contends that it would have made a difference in Jones' chances of survival. On this issue of causation, the plaintiff seeks an appropriate medical review panel instruction by way of the motion for a preliminary determination.

Plaintiff Jones originally filed claims against Dr. Griffith and Parkview Memorial Hospital. Since both defendants were qualified health care providers under Indiana law, the plaintiff was required to file the proposed complaint with the

---

1. I.C. 16–19.5–10–3 requires the court to enter its ruling within thirty (30) days after the motion for a preliminary determination is heard. Indiana courts take this provision seriously, so that a violation may lead to disqualification of a particular judge, if requested. *See Hepp v. Pierce*, 460 N.E.2d 186, 189 (Ind.App.1984). The court notes its decision comes well before the 30 day deadline.

Indiana Department of Insurance and was required to proceed through a medical review panel. I.C. 16–9.5–9–2. *See also Hines v. Elkhart General Hospital,* 465 F.Supp. 421 (N.D.Ind.), *aff'd,* 603 F.2d 646 (7th Cir.1979). Parkview Hospital was later dismissed, leaving Dr. Griffith as the sole defendant.

Prior to the initiation of this preliminary determination proceeding, a medical review panel was formed, consisting of John W. Whiteleather, Jr., attorney, as panel chairman, and three physicians. The parties were preparing their written materials for submission to the panel for a determination when the plaintiff initiated this proceeding.

Under I.C. 16–9.5–10–1, the parties to a proceeding under Indiana's Medical Malpractice Act may file a copy of the proposed complaint and a written motion seeking a preliminary determination of an issue of fact or law. The statute requires the moving party or his attorney to serve summonses on the Commissioner of Insurance, each nonmoving party to the proceeding, and the chairman of the medical review panel. I.C. 16–9.5–10–2. It is undisputed that both the Commissioner of Insurance and Panel Chairman Whiteleather are residents and citizens of Indiana. Defendant Griffith argues that they are parties and that their presence destroys this court's diversity jurisdiction.

## II.

### Analysis

Before the court addresses the plaintiff's motion for a preliminary determination, it must decide whether defendant's motion to dismiss for lack of subject matter jurisdiction is well taken, and if not, whether the court should abstain. If the Commissioner of Insurance and the panel chairman are necessary parties whose presence destroys diversity jurisdiction, then this action must be dismissed and the plaintiff's motion will not be reached. If, on the other hand, the motion to dismiss for lack of subject matter jurisdiction is not well taken, and there are no grounds for abstention, then the court will have to address the plaintiff's motion for a preliminary determination.

### A.

### Motion to Dismiss for Lack of Subject Matter Jurisdiction

Chapter 10 of the Medical Malpractice Act provides that "a court having jurisdiction over the subject matter and the parties to a proposed complaint filed with the commissioner under this article may, upon the filing of a copy of the proposed complaint and a written motion under this chapter, (1) preliminarily determine any affirmative defense or issue of law or fact that may be preliminarily determined under the Indiana Rules of Procedure; or, (2) compel discovery in accordance with the Indiana Rules of Procedure; or (3) both." I.C. 16–9.5–10–1. There is no dispute in this case that this court has diversity jurisdiction to hear medical malpractice actions which have gone through the procedures of the Indiana Medical Malpractice Act. *Hines v. Elkhart General Hospital,* 603 F.2d 646 (7th Cir.1979). And the defendant does not dispute the fact that this court would have jurisdiction to hear the ultimate claim presented in the plaintiff's proposed complaint. But the defendant argues that this court does not have jurisdiction to make a preliminary determination.

Defendant Griffith's argument that the court lacks subject matter jurisdiction is based primarily on I.C. 16–9.5–10–2. That section of Chapter 10 provides that the Commissioner of Insurance or the chairman of any medical review panel may invoke the jurisdiction of the court to make a preliminary determination. That section also provides that the moving party or his attorney shall cause as many summonses as are necessary to be served on the commissioner and panel chairman. Defendant Griffith argues that the commissioner and panel chairman are necessary and indispensible parties, so that their presence (as Indiana citizens) destroys diversity jurisdiction.

The plaintiff's response to the defendant's argument is two-fold. First, the plaintiff argues that neither the commissioner nor the panel chairman are parties

to the instant preliminary determination matter. The plaintiff relies upon the text of the preliminary determination statute, which refers to the insurance commissioner and the panel chairman as distinct and separate entities from the parties to the underlying cause of action. Second, the plaintiff argues that even if the commissioner and chairman are considered parties for purposes of the preliminary determination, they are merely nominal parties, whose citizenship does not in any way affect the court's jurisdiction.

 Federal courts have jurisdiction over controversies between "citizens of different states" by virtue of 28 U.S.C. § 1332(a)(1) and the United States Constitution, Article III, section 2. The Supreme Court established early on that the "citizens" upon whose diversity a plaintiff grounds jurisdiction must be real and substantial parties to the controversy. *McNutt v. Bland,* 2 How. 9, 15, 11 L.Ed. 159 (1844). Thus, a federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy. *See Navarro Savings Assn. v. Lee,* 446 U.S. 458, 461, 100 S.Ct. 1779, 1782, 64 L.Ed.2d 425 (1980). Although one serving in a representative capacity is a real party in interest in the sense that the action is properly maintained in his name, *see* Fed.R.Civ.P. 17(a), a representative is not necessarily the real party in interest for the purpose of determining diversity jurisdiction. *Betar v. De Havilland Aircraft Canada, Ltd.,* 603 F.2d 30, 32 (7th Cir.1979). It is the law of the state which determines whether the party is a real party in interest for diversity purposes. *Wilsey v. Eddingfield,* 780

F.2d 614, 615 (7th Cir.1985), *cert. denied,* 475 U.S. 1130, 106 S.Ct. 1660, 90 L.Ed.2d 202 (1986).

The court agrees with the plaintiff that neither the insurance commissioner nor the medical review panel chairman can be considered parties under I.C. 16–9.5–10–2. Read carefully, the statute makes it clear that the commissioner and panel chairman are not parties to a proceeding commenced under I.C. 16–9.5–1–1, *et seq.*[2] The first sentence of I.C. 16–9.5–10–2 refers to "any party to a proceeding commenced under this article, the commissioner or chairman of any medical review panel...." The only parties to a proceeding under this article are plaintiff Jones and defendant Griffith. The court notes the very careful language used in the statute. Indiana Code 16–9.5–10–3, for example, refers to the "nonmoving party to the proceeding," which includes the commissioner and the chairman of the medical review panel. Chapter 10 of the Medical Malpractice Act makes it quite clear, therefore, that while the commissioner and panel chairman are parties to a preliminary determination proceeding, they are not parties to the underlying medical malpractice action.

 The difference is significant for purpose of diversity of citizenship and leads the court to the plaintiff's second argument; that is, that even if the commissioner and panel chairman may be considered parties to the preliminary determination proceeding, they are only nominal parties who really have no interest in the action, so that their citizenship cannot affect the court's jurisdiction. *See* Wright & Miller,

---

**2.** The statute reads, in pertinent part:

> Sec. 2. *Any party to a proceeding under this article,* the commissioner or the chairman of any medical review panel, if any, may invoke the jurisdiction of the court by paying the statutory filing fee to the clerk and filing a copy of the proposed complaint and motion with the clerk. The filing of a copy of the proposed complaint and motion with the clerk shall confer jurisdiction upon the court over the subject matter and the parties to the proceeding for the limited purposes stated in this chapter, including the taxation and assessment of costs or the allowance of ex-

penses, including reasonable attorney fees, or both. The moving party or his attorney shall cause as many summonses as are necessary to be issued by the clerk and served on the commissioner, each nonmoving party to the proceedings and the chairman of the medical review panel, if any, unless the commissioner or the chairman is the moving party, together with a copy of the proposed complaint and a copy of the motion pursuant to Rules 4 through 4.17 of the Indiana Rules of Trial Procedure, IC 34–5–1–1.

(Emphasis added.)

*Federal Practice and Procedure:* Civil § 1556 (1971).

The distinction between real and nominal parties was explored in *Navarro*, 446 U.S. at 459–66, 100 S.Ct. at 1781–84. In *Navarro*, individual trustees of a business trust invoked the jurisdiction of the federal court on the basis of their own citizenship without regard to the citizenship of the trust beneficiaries. The Court held that the trustees were real parties to the controversy for purposes of diversity jurisdiction because they were not acting as mere conduits for a remedy flowing to others, because they had legal title, because they managed the assets of the trust, and because they had control over the litigation. *Id.* at 465, 100 S.Ct. at 1784. Beyond that, the court noted that the beneficial shareholders under the trust had no voice in the investment decision which formed the basis of the action and that they had no control over the disposition of the action and could not intervene in the affairs of the trust, except in the most extraordinary situations (i.e., removal of a trustee). *Id.* With all of this in mind, the court held that the trustees were the real parties to the controversy.

A number of important points lead this court to conclude that the commissioner and panel chairman are not real parties to this controversy. First, there is no question under the Seventh Circuit's holding in *Hines v. Elkhart General Hospital,* 603 F.2d 646 (7th Cir.1979), that this court would have jurisdiction to hear the ultimate claim presented in the plaintiff's proposed complaint. Both parties agree that neither the commissioner nor the panel chairman can appear as parties to the underlying action. It seems to the court that if it is undisputed that it has jurisdiction over the ultimate claim and if neither the panel chairman nor the commissioner can appear as parties to the underlying claim, then neither the panel chairman nor the commissioner can defeat this court's jurisdiction in the preliminary determination proceeding.

A preliminary determination proceeding is really an intrinsic part of the actual medical malpractice action. It is important to note that the preliminary determination proceeding does not place any money at risk. Rather, it is a means of inquiring "into the extent and source of the patient's injuries for the purpose of forming [an] expert opinion." *Johnson v. St. Vincent Hospital, Inc.,* 273 Ind. 374, 404 N.E.2d 585, 596 (1980). The panel members fulfill a duty to the public, *id.* 404 N.E.2d at 596, they do not adjudicate the merits of the claim. *Id.* 404 N.E.2d at 595. While the panel opinion is admissible in the subsequent action on the merits, it is not conclusive. *Id.* 404 N.E.2d at 598. Based upon these observations, it seems abundantly reasonable to conclude that a court which has jurisdiction over the ultimate claim, the claim where liability will be determined and moneys will be paid out, has jurisdiction over a preliminary determination, where issues of law or fact are determined or where discovery is compelled. After all, the preliminary determination affects only the panel's opinion, which in turn affects only the evidence in the ultimate case.

The defendant points out that the preliminary determination chapter requires service upon the commissioner and the panel chairman and that either of them may initiate a preliminary determination proceeding. *See* I.C. 16–9.5–10–2. The commissioner's involvement in this regard makes sense, given the commissioner's various responsibilities over the patient's compensation fund,[3] but does not transform the commissioner into a necessary party for diversity purposes. The commissioner's responsibilities are limited solely to the patient's compensation fund, which becomes important if

---

**3.** Indiana Code § 16–9.5–2–2 limits the total recovery for injury or death to $500,000, and the liability of a health care provider is limited to $100,000 per occurrence. I.C. § 16–9.5–2–2(b). Amounts over $100,000 are paid from the patient's compensation fund. I.C. § 16–9.5–2–2(d). The commissioner receives proof of financial responsibility, I.C.

§ 16–9.5–2–6, supervises the terms and conditions of payment from the patient's compensation fund, I.C. § 16–9.5–2–7, and agrees to or contests settlements which effect the fund, I.C. § 16–9.5–4–3. The commissioner also oversees the creation and maintenance of the patient's compensation fund. I.C. § 16–9.5–4–1.

a judgment in excess of $100,000 is obtained, and the commissioner cannot control the litigation or the disposition of the action, like the trustee in *Navarro* could. *See* 446 U.S. at 464–65, 100 S.Ct. at 1783–84. The court notes as well that the commissioner's response to the summons indicates that the motion "is not directed towards the commissioner, therefore the commissioner makes no response to the merits." While this is a fairly close question, the court does not think the commissioner can be viewed as a necessary and indispensible party. The commissioner's responsibilities are limited to the patient's compensation fund, the commissioner has indicated that he has no interest in the merits of the preliminary determination, and the commissioner cannot participate in the ultimate medical malpractice action. For all of these reasons, the court concludes that the commissioner's responsibilities do not transform him into a necessary and indispensible party.

The medical review panel chairman, Attorney Whiteleather, also has various duties imposed by statute.[4] These duties relate to the medical review panel's opinion and the process by which that opinion is rendered. The chairman has no stake or interest in the outcome of the litigation and his sole responsibility is to guide the medical review panel in rendering its opinion. He is not a necessary party in any meaningful sense, but rather, facilitates the panel in rendering its opinion. Like the commissioner, he cannot participate as a party in the underlying cause of action. And he too has indicated in response to the summons that he has no interest in the preliminary determination matter. Of course, it makes perfect sense that I.C. 16–9.5–10–2 gives the panel chairman the right to invoke the jurisdiction of the court to make a preliminary determination, since the chairman himself may want clarification on issues of fact or law. In this case, the

chairman has not invoked the jurisdiction of this court and the right that he has to do so does not make him a real party to the litigation.

The real parties in this case are plaintiff Jones and defendant Griffith. They are the ones who have something to gain or lose in the ultimate outcome and they are the ones who exercise complete control over the litigation. To the extent that matters of fact or law are determined in this preliminary determination proceeding, those matters will only directly affect plaintiff Jones and defendant Griffith. And if this court is in a position to instruct these two parties on the law in the ultimate trial of this cause, then this court is also in a position to make preliminary determinations of law. For all of these reasons, the court does not think that service of summons on either the commissioner or the panel chairman destroys its diversity jurisdiction and the defendant's motion to dismiss is hereby denied.

### B.

### *Abstention*

Defendant Griffith argues that if the court finds that diversity jurisdiction exists it should abstain and let the state courts make the preliminary determination in this case. While defendant Griffith's briefs mention various forms of abstention, his lawyer made it clear at oral argument that he is really relying upon what has come to be known as the *Burford* abstention, named after the case of *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Before going on to discuss the application of *Burford* abstention to the facts of this case, the court would like to make an important observation.

■ The general rule is that district courts have a duty to adjudicate controver-

---

4. The chairman acts in an advisory capacity, expedites the selection of panel members, convenes the panel, and establishes a schedule for the submission of evidence. I.C. § 16–9.5–9–3. He advises the panel on legal questions and prepares the panel opinion. I.C. § 16–9.5–9–4. He presides at the meetings convened by the

parties after submission of the evidence. I.C. § 16–9.5–9–5. The chairman submits the panel's opinion to the commissioner and all parties and attorneys. I.C. § 16–9.5–9–10. And for all of this, the chairman receives a very modest fee. *Id.*

sies properly brought before them. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). "The doctrine of abstention, under which a district court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception ..." to the general rule. *Id., quoting County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959). With this in mind, the court turns to an analysis of *Burford* abstention.

In *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), the federal district court's jurisdiction rested both upon a federal question and the diversity of the parties. *Burford* involved an attack upon the validity of an order of the Texas Railroad Commission, which granted a permit to drill oil wells. In upholding the district court's decision to abstain, the Supreme Court reasoned that the Texas regulatory system governing oil was a complex matter of great public importance. Texas, the Court noted, had established a system for thorough state court review of the Commission's orders. The Court held that delay, confusion and "needless federal conflict with the state policy [would be] the inevitable product of this double system of review." *Id.* at 327, 63 S.Ct. at 1104.

■ On its face *Burford* abstention would seem to be appropriate only in a case involving basic matters of state policy, complicated by nonlegal considerations of a predominantly local nature, where the state has concentrated judicial review of administrative orders of the sort involved in a state court. Under this reading of *Burford*, it is clear that abstention is inappropriate in this case, since there is no administrative order to review, not to mention the absence of concentrated state review. But as some commentators have noted, this reading of *Burford* is too precise to be squared with subsequent cases. *See* Wright, Miller and Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 4244 (2d ed. 1988).

In *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959), the Court held that abstention is appropriate where the exercise of federal jurisdiction would create needless friction by unnecessarily enjoining state officials from executing public policy, citing *Alabama Public Service Commission v. Southern R. Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). And later, in the case of *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976), the Court held that "[a]bstention is also appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *See also Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959). Thus, beyond the straightforward *Burford*-type case, *Burford* abstention seems to be appropriate in two other kinds of cases: cases where a diversity litigant seeks to restrain the exercise of authority vested in state officers and cases where there is a difficult question of state law bearing on policy problems of substantial public importance transcending the result in the case at bar.

■ Clearly, the only variation of *Burford* abstention which might apply in this case is that which applies in cases presenting difficult questions of state law which bear on policy problems of substantial public importance transcending the case at bar. But this case does not involve policy problems of substantial public importance, at least not the kind referred to in *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959).

*Louisiana Power & Light* involved sensitive eminent domain questions. The City of Thibodaux filed a petition for expropriation asserting a taking of the land, buildings and equipment of Louisiana Power & Light Company. *Id.* at 25, 79 S.Ct. at 1071. The district court stayed the proceedings until the Supreme Court of Louisiana could interpret the applicable state statute. *Id.* at 26, 79 S.Ct. at 1071. Noting the ex-

tremely important issue of eminent domain, the Court held that abstention was appropriate, reasoning that the city's power to condemn had been challenged, introducing the aspect of sovereignty into the case and raising questions about local powers, more appropriately decided in state court. *Id.* at 28, 79 S.Ct. at 1072. Relying on the peculiarity of the eminent domain issues and the specific legal difficulties raised, the Court departed from the general rule and upheld the district court's decision to abstain.

Like *Louisiana Power & Light,* the Court found that important policy issues justified abstention in *Kaiser Steel Corp. v. W.S. Ranch Co.,* 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968). In *Kaiser,* the respondent claimed that the petitioner had trespassed and sought both an injunction and damages. *Id.* at 593, 88 S.Ct. at 1754. The petitioner argued that a state statute authorized the trespass in order to give it water rights. *Id.* In turn, the respondent argued that if the statute could be read to authorize condemnation of private land to secure water rights, then the statute would violate New Mexico's constitutional provision permitting the taking of private property only for public use. *Id.* at 594, 88 S.Ct. at 1754. Finding the issue a "crucial one" involving an issue of "vital concern in the arid state of New Mexico, where water is one of the most valuable natural resources ...," the Court held that abstention was proper. *Id.* at 594, 88 S.Ct. at 1754.

Both *Louisiana Power & Light* and *Kaiser* involved difficult questions of state law bearing on policy problems of *substantial public importance.* Other *Burford* abstention cases of this variety have also involved policy problems of substantial public importance. *See, e.g., Smith v. Metropolitan Property and Liab. Ins. Co.,* 629 F.2d 757 (2d Cir.1980) (involving substantial insurance issues affecting the integrity of Connecticut's regulatory scheme); *Naylor v. Case and McGrath, Inc.,* 585 F.2d 557 (2d Cir.1978) (involving policies related to an important consumer protection statute). While this case does involve some difficult questions of state law (questions relating to the standard of care and to proximate cause in medical malpractice actions) it does not involve issues of substantial public importance.

Of course, every difficult legal question is important in the sense that the court's decision, by virtue of the doctrine of *stare decisis,* binds future litigants in similar cases. But that is always true and there is no abstention doctrine based solely on difficult questions in diversity cases. To the contrary, the Supreme Court has made it very clear that district courts cannot abstain simply because they are faced with difficult issues of state law:

> [T]he difficulties of ascertaining what the state courts may hereafter determine the state law to be do not in themselves afford a sufficient ground for a federal court to decline to exercise its jurisdiction to decide a case which is properly brought to it for decision. * * *
> Congress having adopted the policy of opening the federal courts to suitors in all diversity cases involving the jurisdictional amount, we can discern in its action no recognition of a policy which would exclude cases from the jurisdiction merely because they involve state law or because the law is uncertain or difficult to determine. * * * To remit the parties to the state courts is to delay further the disposition of the litigation which has been pending for more than two years and which is now ready for decision. It is to penalize petitioners for resorting to a jurisdiction which they were entitled to invoke, in the absence of any special circumstances which would warrant a refusal to exercise it.

*Meredith v. City of Winter Haven,* 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943). It is now well settled that "the mere difficulty in ascertaining state law does not justify abstention in private litigation...." Wright, Miller and Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 4246 (2d ed. 1988). So this court does not think it can abstain simply because this case involves difficult questions.

There is one last point which the court must address regarding abstention. Without specifically explaining exactly how this point fits into the analysis, the defendant argues that the statute requires that pre-

liminary determinations be made under the Indiana Rules of Procedure, *see* I.C. 16–9.-5–10–1, and that this court is only empowered to apply the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 1. Presumably, according to the defendant, this reference to the Indiana Rules of Procedure indicates the legislature's intent that preliminary determinations only be made by state courts. That, defendant Griffith argues, is grounds for abstention.

The court does not agree. First, it is not at all clear just what the legislature contemplated by its reference to the Indiana Rules and neither party offered any cogent explanation. The Rules would seem to come into play primarily when a preliminary determination is being used to compel discovery, and I.C. 16–9.5–10–1 suggests just that. Second, as the plaintiff's lawyer pointed out at oral argument, the Indiana Rules of Procedure mirror the Federal Rules of Civil Procedure, so that this court could certainly accomplish a preliminary determination under the Federal Rules.

The reference to the Indiana Rules is not a sufficient basis for abstention. If the legislature intended for only state courts to make preliminary determinations it could very easily have said so. The most reasonable explanation for the reference to the Indiana Rules is legislative oversight. This court will not depart from the general rule that it hear controversies properly brought before it simply because the statute mentions the Indiana Rules of Procedure. The court does not believe that the legislature intended to limit jurisdiction to state courts and the Federal Rules will be applied in place of the Indiana Rules.[5]

### C.

### *Plaintiff's Motion for a Preliminary Determination*

Having determined that diversity jurisdiction exists and that abstention is inap-propriate in this case, the court must now address the issues presented in the plaintiff's motion for a preliminary determination under I.C. 16–9.5–10–1. The first issue raises two questions: (1) what is the appropriate standard of care in informed consent cases under Indiana law, and (2) can the medical review panel render an "expert opinion" regarding compliance with this standard of care, or is there a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the jury? The second issue relates to the phrase "a factor," as used in I.C. 16–9.5–9–7(d) and the meaning of that phrase for purposes of the medical review panel's expert opinion.

i.

### *Informed Consent*

As just noted, this first issue involves two questions. The court must answer the first question, the question regarding the appropriate standard of care in Indiana for informed consent cases, before the second question can be answered. The plaintiff argues that the appropriate standard of care in informed consent cases necessarily raises issues of fact which cannot possibly be resolved by the medical review panel's expert opinion in this case, so that the court should find that there are material issues of fact, not requiring expert opinion, bearing on liability for consideration by the jury. The plaintiff argues that informed consent is a two sided coin. The first side, the plaintiff concedes, involves issues such as the existence of a risk, its likelihood of occurrence, and the type of harm in question, which are appropriate for expert opinion. But the second side, the plaintiff argues, views the standard of care through the patient's eyes. What would the patient want to know? Would the patient consider

---

**5.** The really important point here is that the reference to the Indiana Rules of Procedure provides no ground for abstention *in this case.* As the analysis demonstrates, abstention decisions are made on a case by case basis. If a federal court was asked to make a preliminary determination, for example, to compel discovery, and the governing Indiana rule was dif-ferent than the federal rule, then the court *might* find a basis for abstention. But this case presents no specific dispute which makes the reference to the Indiana rules relevant. Indeed, as pointed out above, neither party could explain what the legislature contemplated by its reference to the Indiana Rules.

a particular risk, its likelihood of occurrence, or the type of harm in question, important or material in deciding whether to go ahead with the procedure in question? Because the standard of liability for informed consent necessarily involves issues of fact which are appropriate for resolution by lay witnesses, and are material in this case, the plaintiff argues that the medical review panel can reach no other decision than that there are material issues of fact, not requiring expert opinion, for the jury to decide.

Defendant Griffith argues that the proper standard of care for informed consent in Indiana involves only expert opinion and raises no material issues of fact bearing on liability for consideration by the jury. If defendant Griffith is correct and if the proper standard for informed consent in Indiana depends only on expert opinion, then the medical review panel can certainly render an opinion regarding compliance with the standard.

Indiana first recognized the doctrine of informed consent in *Joy v. Chau*, 177 Ind. App. 29, 377 N.E.2d 670, 676–77 (1978). In *Joy,* the court recognized that the doctrine is based upon a duty owed by a physician to his patient and is a negligence concept. *Id.* 377 N.E.2d at 676, citing the seminal case of *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093 (1960), *as modified* at 187 Kan. 186, 354 P.2d 670 (1960). The court went on to hold in *Joy* that the physician's duty, which arises as a matter of law, is to "make a reason-able disclosure of material facts relevant to the decision which the patient is requested to make." *Id.* 377 N.E.2d at 677. In articulating the physician's duty, the court in *Joy* relied upon the important case of *Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972) (en banc).

In *Cobbs*, the California Supreme Court rejected the argument that the standard of care in informed consent cases is based solely upon what other doctors in the medical community would disclose to similar patients. Instead, the court reasoned that "the scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is whatever information is material to the decision." *Cobbs*, 104 Cal.Rptr. at 515, 502 P.2d at 11. The court reasoned that while medical doctors, as experts, appreciate the risks inherent in a medical procedure and the probability of its success, the weighing of these risks against the individual subjective fears and hopes of the patient is not an expert skill. "Such evaluation and decision is a non-medical judgment *reserved to the patient alone." Id.* at 514, 502 P.2d at 10 (emphasis added). The *Cobbs* decision clearly supports the plaintiff's position that the doctrine of informed consent is a two-sided coin and that the patient's right of self-decision, which is "the measure of the physician's duty to reveal," *see Cobbs*, 104 Cal.Rptr. at 515, 502 P.2d at 11, raises issues of material fact which cannot be resolved by expert opinion alone.

■ The second Indiana case to address the doctrine of informed consent, the case of *Revord v. Russell*, 401 N.E.2d 763 (Ind. App.1980), also relied upon *Cobbs v. Grant.* In *Revord*, the trial court's grant of Dr. Russell's motion for judgment on the evidence was affirmed, in part on the basis that expert medical testimony is required to establish the content of a physician's reasonable disclosure under the doctrine of informed consent. *Id.* at 766. Since the plaintiff had offered no expert medical testimony, the court held that the defendant was entitled to judgment on the evidence. *Id.* at 767. The court noted that the case involved brain surgery, so that the risks, the likelihood of success, etc., were not matters within the common knowledge of laymen. *Id.* *Revord* thus stands for the proposition, a proposition not disputed by the plaintiffs or any of the cases they cite, that expert testimony is generally required to establish a cause of action based upon the doctrine of informed consent.[6]

---

**6.** It is well recognized that in certain informed consent cases, where the medical risks and the likelihood of occurrence are within the realm of ordinary human experience, expert testimony is not required. *See Revord,* 401 N.E.2d at 766–67. But this is not that kind of case and the plaintiff happily concedes that expert testimony is necessary.

Beyond its recognition of the general rule, *Revord* is extremely important in its recognition of the patient's right of self-decision. Relying upon *Cobbs,* the court held that it is the duty of a physician "to make a reasonable disclosure of material facts relevant to the decision *which the patient is requested to make." Revord,* 401 N.E.2d at 766, citing *Cobbs, supra* (emphasis added). In defining the standard of care, the court held that:

> *[T]he patient's right of self-decision is the measure of the physician's duty to reveal.* That right can be effectively exercised only if the patient possesses adequate information to enable an intelligent choice. The scope of the physician's communications to the patient, then, must be measured by the patient's need and that need is whatever information is material to the decision. Thus the test for determining whether a potential peril must be divulged is its materiality to the patient's decision. *Canterbury v. Spence,* 464 F.2d 772, 786 (D.C.D.C.), *cert. denied,* 409 U.S. 1064 [93 S.Ct. 560, 34 L.Ed.2d 518] (1972).

*Revord,* 401 N.E.2d at 766 (emphasis added), citing *Cobbs,* 104 Cal.Rptr. at 515, 502 P.2d at 11. Thus, in articulating this standard the court expressly recognized the holding in *Cobbs,* that the standard of informed consent depends upon the patient's needs and whatever information is material to those needs.

Both *Revord v. Russell* and *Cobbs v. Grant* relied extensively upon the seminal case of *Canterbury v. Spence, supra. Canterbury* contains a lengthy and exceedingly thoughtful discussion of the doctrine of informed consent and clearly articulates the plaintiff's position in this case—that lay witness testimony can competently establish a physician's failure to disclose particular risk information, the patient's lack of

knowledge of the risk, and the adverse consequences following the treatment. *See Canterbury,* 464 F.2d at 792. The *Canterbury* court emphatically stated that "medical facts are for medical experts [footnote omitted] and other facts are for any witness—expert or not—having sufficient knowledge and capacity to testify to them." *Id.* The court held that "whenever nondisclosure of particular risk information is open to debate by reasonable-minded men, the issue is for the finder of the facts." *Id.* at 788. On the issues of precisely what the patient must be informed of, the court held that "the scope of the physician's communications to the patient, then, must be measured by the patient's need, [footnote omitted] and that need is the information material to the decision. Thus the test for determining whether a particular peril must be divulged is its materiality to the patient's decision: all risk potentially affecting the decision must be unmasked." *Id.* at 786–87. This decision, like the *Cobbs* decision, clearly stands for the proposition that the standard of care (or the duty to which the doctor must conform his conduct) in informed consent cases depends not only on expert opinion, but also on lay witness testimony regarding what the patient would want to know.

■ There can really be no doubt that the standard of care enunciated in *Cobbs* and *Canterbury* is dependent both on expert opinion and lay witness testimony.[7] The Indiana Court of Appeals adopted the reasoning of the *Cobbs* and *Canterbury* courts in *Revord v. Russell,* and no Indiana cases have altered that standard since *Revord* was decided. *See, e.g., Kranda v. Houser–Noborg Medical Corp.,* 419 N.E.2d 1024, 1037–38 (Ind.App.1981); *Searcy v. Manganhas,* 415 N.E.2d 142, 144 (Ind.App. 1981). The court therefore agrees with the

---

**7.** The defendant's argument that the modified locality rule sets the standard in informed consent does not deal adequately with the holding in *Revord, supra,* and that court's reliance on *Cobbs* and *Canterbury.* Both *Cobbs* and *Canterbury* are exceedingly important cases and it is inconceivable to this court that the Indiana Court of Appeals would rely upon those cases as it did without a full appreciation for their hold-

ings. The modified locality rule is still the rule in Indiana, despite the criticism it has received by the Indiana courts. *See Wilson v. Sligar,* 516 N.E.2d 1099, 1101 (Ind.App.1987). But that rule has only been applied in non-informed consent cases. *See, e.g., id.; Iterman v. Baker,* 214 Ind. 308, 15 N.E.2d 365 (1938); *Yang v. Stafford,* 515 N.E.2d 1157, 1161 (Ind.App.1987). In informed consent cases it does not set the standard.

plaintiff that the standard of care in Indiana for a medical malpractice cause of action based upon the doctrine of informed consent requires not only expert opinion on the relevant medical issues such as the risks involved and the type of potential harm in question, but also lay witness testimony on what a reasonable patient would have wanted to know.[8]

The plaintiff asks the court not only to define the standard for informed consent cases, but also to rule that in this case "there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or a jury." *See* I.C. 16–9.5–9–7. For the following reasons, the court agrees that there are material issues of fact in this case and that the medical review panel must be instructed to render its opinion under I.C. 16–9.5–9–7(c).

Indiana's Medical Malpractice Act provides that the medical review panel shall have the sole duty to render one or more of the following expert opinions, which shall be in writing and signed by the panelists.[9] The statute is in derogation of the common law and must therefore be strictly construed. *See B.G.L. v. C.L.S.*, 175 Ind.App. 132, 369 N.E.2d 1105, 1108 (1977). *See also* 26 I.L.E. *Statutes* § 174 (1960). The plaintiff argues that the statute mandates "expert opinion" as opposed to "expert testimony" and argues that where the ultimate opinion required by law necessarily involves lay witness testimony, the panel's expert opinion is objectionable, "not be-

cause it seeks an opinion on the ultimate issue, but because the opinion testimony would be of no value to the jury." *See* Miller, 13 *Indiana Practice, Indiana Evidence* § 704.101 opinion on ultimate issue, p. 72. *See also Augustine v. State*, 461 N.E.2d 101, 107 (Ind.1984); *Rosenbalm v. Winski*, 165 Ind.App. 378, 332 N.E.2d 249, 254 (1975). The plaintiff argues that where lay witness testimony is a part of determining the standard of care, the medical review panel, which can only render expert opinions, can reach no other opinion than that there are material issues of fact.

■ The court agrees that the statute limits the medical review panel to rendering expert opinions and the panel is in no position to offer testimony generally and is clearly incapable of offering the necessary lay witness testimony required to ascertain the standard of care in this case. Indiana's case law bears this out. In *Johnson v. St. Vincent Hospital, Inc.*, 273 Ind. 374, 404 N.E.2d 585 (1980), the court upheld the constitutionality of the Medical Malpractice Act and in doing so noted in numerous places the role of the medical review panel. The court noted that the jury's verdict would depend upon the impact of the panel's *"expert opinion." Id.* 404 N.E.2d at 593 (emphasis added). Later, the court held that:

> The statute contemplates that the panel will function in an informal and reasonable manner. It is guided by a trained lawyer who presumptively will not deny

---

8. In determining whether a doctor must disclose a potential risk (the risk of death from anaphylactic reaction), the standard is objective—whether the undisclosed risk would have been significant to a reasonable patient under the same circumstances in deciding whether or not to forego treatment or therapy. *Canterbury*, 464 F.2d at 787.

9. Indiana Code 16–9.5–9–7 reads as follows:

> The panel shall have the sole duty to express its expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care as charged in the complaint. After reviewing all evidence and after any examination of the panel by counsel representing either party, the panel shall, within thirty (30) days, render one or more of the following expert opinions

which shall be in writing and signed by the panelists:

> (a) The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint.
>
> (b) The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint.
>
> (c) That there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury.
>
> (d) The conduct complained of was or was not a factor of the resultant damages. If so, whether the plaintiff suffered: (1) any disability and the extent and duration of the disability, and (2) any permanent impairment and the percentage of the impairment.

to each party a reasonable opportunity to present its evidence and authorities. The scope of the panel's function is limited. It does not conduct a hearing or trial and does not render a decision or judgment. There is, therefore, no reason to mandate that the statute regulate burdens of proof or production and to otherwise specify procedures applicable in hearings and trials. *The panel is conducting a rational inquiry into the extent and source of the patient's injuries for the purpose of forming its expert opinion.* *Johnson,* 404 N.E.2d at 596 (emphasis added). Both statute and case law, therefore, have recognized that the panel's role is simply to render an expert opinion which may later be admitted at trial.

There are material issues of fact in this case not requiring expert opinion which bear on the issue of liability. The risk of death was not disclosed to Mr. Jones. As the court noted in *Canterbury,* "whenever non-disclosure of particular risk information is open to debate by reasonable-minded men, the issue is for the finder of the facts." *Canterbury,* 464 F.2d at 788. And other courts have noted that even "the possibility of serious complications from [an angiogram]" cannot be discounted as *de minimus. Salis v. United States,* 522 F.Supp. 989, 999 (D.Pa.1981) (applying similar informed consent standard under Pennsylvania law). As that court noted, to honor the patient's right of self-decision, the physician must disclose those risks which a reasonable man would consider material to his decision whether or not to undergo treatment. *Id.* at 999. Clearly, the risk of death could reasonably be viewed as material to a patient's decision of whether to undergo treatment. In fact, the *Cobbs* court held "that when a given procedure inherently involves a known risk of death or serious bodily harm, a medical doctor has a duty to disclose to his patient the potential of death or serious harm, and to explain in lay terms the complications that might possibly occur." *Cobbs,* 104 Cal.Rptr. at 515, 502 P.2d at 11. *See also Canterbury,* 464 F.2d at 787–88. In this case there are clearly material issues of fact not requiring expert opinion

which bear on the issue of liability and the court holds that the medical review panel is bound to issue its opinion under I.C. 16–9.-5–9–7(c).

The court notes that I.C. 16–9.5–10–1 draws a distinction between subdivision (c) of I.C. 16–9.5–9–7 and subdivisions (a), (b) and (d). The preliminary determination statute states that "the court has no jurisdiction to rule preliminarily upon any affirmative defense or issue of law or fact reserved for written opinion by the medical review panel under I.C. 16–9.5–9–7(a), (b) and (d)." In *Johnson v. Padilla,* 433 N.E. 2d 393, 395–96 (Ind.App.1982), the court granted defendant Padilla's motion for summary judgment. A proposed complaint for damages against Dr. Padilla was filed with the Commissioner of Insurance under Indiana's Medical Malpractice Act alleging that plaintiff Johnson had given birth to a female infant in October of 1976, and was readmitted to the hospital when she exhibited post-partum hemorrhage secondary to retained products of conception. *Id.* at 394. The plaintiff alleges that the doctor negligently performed a dilation or curettage by scraping all of the endometrial tissue from Johnson's uterus and that as a result of Padilla's alleged negligence, Johnson could no longer conceive and bear children. *Id.* Before the medical review panel had issued its expert opinion, a preliminary determination proceeding was initiated by Dr. Padilla on the issue of whether she had performed dilation and curettage.

The court granted Dr. Padilla's motion for summary judgment holding that Dr. Padilla had not actually performed the procedure, but rather, only concurred with another physician in the procedure. The court rejected the plaintiff's argument that once the medical review panel's process is under way it must proceed to a conclusion, so that the motion for summary judgment was improper. *Padilla,* 433 N.E.2d at 396. The court reasoned that I.C. 16–9.5–10–1 gives the court authority to determine whether or not factual issues exist on a matter not requiring expert opinion. *Id.* at 396. The court held that "the issue of whether Dr. Padilla performed the D & C is

an issue of fact which does not require expert opinion." *Id.* The language of I.C. 16–9.5–10–1, which provides that courts may preliminarily rule on matters contained in I.C. 16–9.5–9–7(c), and the holding of the *Padilla* case, is particularly significant in this case. Both the statute and the *Padilla* case indicate that this court may find the existence of material fact under I.C 16–9.5–9–7(c), and instruct the panel accordingly. It is true that not every informed consent case will necessarily involve "material" issues like this one does. But when material issues are involved, as they are here, the court may instruct the panel to find that "there is material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury." I.C. 16–9.5–9–7(c).

When issues material to a patient's decision whether or not to forego treatment exist, Indiana's doctrine of informed consent requires not only expert opinion, but also lay witness testimony regarding what a reasonable patient would have wanted to know, to properly ascertain the standard of care. Material issues of fact exist in this case which cannot be resolved by expert opinion. Accordingly, the medical review panel is instructed pursuant to I.C. 16–9.5–10–1 to find under I.C. 16–9.5–9–7(c) "that there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury".[10]

ii.

### *The Meaning of the Phrase "A Factor"*

The plaintiff asks the court to determine that the phrase "a factor" in I.C. 16–9.5–9–7(d) means something different than the phrase "substantial factor" as that phrase is used in Indiana cases to describe the standard for proximate cause in negligence cases. The plaintiff further asks the court to give meaning to the phrase "a factor" by adopting the test for causation used in the majority of states in medical malpractice actions; that is, that the defendant's conduct either increased the risk of harm to decedent Jones or decreased his chance of survival.

Defendant Griffith argues that any determination regarding the meaning of the phrase "a factor" invades the province of the medical review panel and points out the fact that the panel is not bound to render an opinion at all under I.C. 16–9.5–9–7(b).[11] It is true, of course, that the medical review panel is not bound to render an opinion under I.C. 16–9.5–9–7(d) and nothing in this order should be taken to indicate that it must. It does not follow that this court should not preliminarily determine the meaning of the phrase "a factor" as used in the statute. In fact, I.C. 16–9.5–10–1 specifically states that the court may preliminarily determine issues of law. And the meaning of the phrase "a factor" is clearly an issue of law which must be determined before the medical review panel can render its expert opinion under I.C. 16–9.5–9–7(d) if it chooses.

The court notes in addition that this case involves not only the plaintiff's informed consent claim, but also the plaintiff's claim that Dr. Griffith negligently failed to provide proper treatment and resuscitation to decedent Jones (i.e., failed to inject the epinephrine intravenously).[12] Subsection

---

**10.** The plaintiff asks the court also to preliminarily determine the proper proximate cause standard. Breach of the duty to disclose does not alone establish liability; there must be a "causal relationship between the physician's failure to adequately divulge and damage to the patient." *Canterbury,* 464 F.2d at 790. A causal connection exists when disclosure of significant risks would have resulted in a decision against treatment. The plaintiff asks the court to determine that the standard is subjective and not objective; that is, that the proper question is whether disclosure of the risks would have caused Mr. Jones to forego the angiogram. But whether the proximate cause standard is subjective (what Jones would have done) or objective

(what a reasonable person in a similar situation would have done) does not eliminate the material factual issues which relate to the standard of care. *Id.* Accordingly, the court declines to preliminarily determine the proximate cause standard. Such a determination need only be made if the case goes to trial.

**11.** The statute states that the panel shall "render *one or more* of the following expert opinions...." *See* I.C. 16–9.5–9–7. (Emphasis added.)

**12.** The proposed complaint alleges that Dr. Griffith:

(d) of I.C. 16–9.5–9–7 is relevant to both claims and the medical review panel may well want to render its expert opinion on whether Dr. Griffith's conduct was or was not a factor resulting in Jones' death. If the panel chooses to render such an opinion, it will certainly need to know the meaning of the phrase "a factor."

The parties agree that Indiana uses the substantial factor test for causation and that that is the test that will ultimately be used if this case goes to trial. *See, e.g., Hayes Freight Lines, Inc. v. Wilson*, 226 Ind. 1, 77 N.E.2d 580 (1948); *Johnson v. Bender*, 174 Ind.App. 638, 369 N.E.2d 936 (1978); *McIntosh v. Pennsylvania Rail Co.*, 111 Ind.App. 550, 38 N.E.2d 263, 266 (1941) (en banc). Recognizing the established "substantial factor" standard for causation, the plaintiff argues that the legislature intentionally reduced the standard for causation which is to be applied by the medical review panel when it used the phrase "a factor," omitting the word "substantial." The plaintiff asks the court not only to recognize the change and instruct the panel accordingly, but also to give meaning to the phrase "a factor" by interpreting that phrase to mean any increased risk of harm or decreased chance of survival.

■ The court agrees that the Indiana legislature's use of the phrase "a factor" lowers the threshold of proof for causation for purposes of the medical review panel's expert opinion. As noted earlier, the Medical Malpractice Act is in derogation of the common law and must be strictly construed. *See B.G.L.*, 369 N.E.2d at 1108. *See also In re Adoption of Force*, 126 Ind.App. 156, 131 N.E.2d 157 (1956); *Hummer v. School City of Hartford City*, 124 Ind.App. 30, 112 N.E.2d 891 (1953). Subsection (d) of I.C. 16–9.5–9–7 clearly changes the common law rule (the substantial factor rule) for purposes of the medical

review panel and the court must strictly interpret that change.

There is further support for the plaintiff's position. Under Indiana law, courts must give "effect to the plain and ordinary meaning of words used in a statute." *State ex rel. Southern Hills v. Dubois Cty.*, 446 N.E.2d 996, 1001 (Ind.App.1983). Judicial construction is permissible only where the statutory language is ambiguous or of doubtful meaning. *Sue Yee Lee v. Lafayette Home Hospital*, 410 N.E.2d 1319, 1322–23 (Ind.App.1980). If statutory language is clear and unambiguous, the court may not substitute language which it feels the legislature might have intended. *Brighton v. Schoffstall*, 401 N.E.2d 84 (Ind.App.1980). Beyond that, words which are otherwise not defined within a statute are given their ordinary meaning. *Peabody Coal Co. v. Ridenour*, 515 N.E.2d 1163 (Ind.App.1987).

The phrase "a factor" is unambiguous and must be given its plain and ordinary meaning. WEBSTER'S NEW WORLD DICTIONARY defines factor as "any of the circumstances, conditions, etc. that bring about a result." *See* WEBSTER'S NEW WORLD DICTIONARY (2d College ed. 1978); *see also Peabody, supra* (using WEBSTER'S DICTIONARY and BLACK'S LAW DICTIONARY to construe the plain and ordinary meaning of "adjacent" and "incidental" as used in the statute). BLACK'S LAW DICTIONARY (5th ed. 1979) defines factor as "any circumstance or influence which brings about or contributes to a result...." In the case at bar, the use of the phrase "a factor" indicates that if Dr. Griffith's conduct contributed to any of the circumstances, conditions, etc. that brought about decedent Jones' death, then Dr. Griffith's conduct was "a factor" resulting in Jones' death. The medical review panel need not find that Griffith's conduct was a "substantial factor."

---

failed to inform plaintiff's decedent of the serious risks, including death, involved in an abdominal arteriogram; he failed to properly monitor vital signs of plaintiff's decedent, although plaintiff's decedent was at greater risk of complications than the average patient due

to his history of allergies; he failed to diagnose impending cardiac collapse; and failed to provide proper treatment and resuscitation to plaintiff's decedent, Jon Jones, for his adverse reaction to the radiographic contrast material.

**462**

The court's interpretation of the statute gives the phrase "a factor" its plain and ordinary meaning and is consistent with the legislature's intent that the medical review panel not usurp the traditional function of the jury in making ultimate determinations. Indiana Code 16–9.5–9–9 provides that the panel opinion "shall be admissible as evidence in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive...." It is for the medical review panel to determine whether Dr. Griffith's conduct was "a factor," but it is for the trier of fact to ultimately determine whether Dr. Griffith's conduct was a "substantial factor."

The plaintiff has further asked the court to define "a factor" as any increase in risk of harm or decrease in chance of survival, in accordance with the definition used by the majority of the states which have addressed this issue. *See, e.g.,* Annotation, *Medical Malpractice: "Loss of Chance" Causality,* 54 A.L.R. 4th 10 (1987). While Indiana (which according to the plaintiff has not yet had the opportunity to adopt this enlightened standard) might well adopt the position taken by the majority of the states which have addressed the issue, the court does not think it necessary or prudent to give the phrase "a factor" additional definition beyond its plain and ordinary meaning enunciated above. Accordingly, in determining whether the conduct complained of was or was not "a factor" of the resultant damages, the panel is instructed that Dr. Griffith's conduct was a factor if it was a circumstance or condition that brought about Jones' death. The panel is further instructed that it is not to determine whether Dr. Griffith's conduct was a "substantial factor." That is a matter for the jury.

### III.

#### *Conclusion*

This court has diversity jurisdiction to make the preliminary determination requested by the plaintiff. While this case presents a number of difficult questions under Indiana law, there are no grounds for abstention. With respect to the issue of informed consent, the medical review panel is instructed pursuant to I.C. 16–9.5–10–1 to find under I.C. 16–9.5–9–7(c) "that there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or a jury." The panel is further instructed that the phrase "a factor" used in I.C. 16–9.5–9–7(d) lowers the threshold for proof of causation which applies at trial where the "substantial factor" standard is applied. "A factor" means any circumstance or condition which brings about or contributes to a result.