**David M. PAYNE, Personal Representative of the Estate of Cloyd A. Payne, Deceased, Appellant (Counter–Plaintiff),**

**v.**

**MARION GENERAL HOSPITAL, Miles W. Donaldson, M.D. and Marion Family Practice, Inc., Appellees (Counter–Defendant and Third Party Defendants).**

**No. 80A02–8802–CV–84.**

Court of Appeals of Indiana, Second District.

Feb. 5, 1990.
Rehearing Denied March 26, 1990.

**1044**

C. Robert Rittman, Biddinger & Johnson, Marion, for David M. Payne.

Thomas J. Trauring, Fell McGarvey & Trauring, Kokomo, for Marion General Hosp.

Albert C. Harker, Polly A. Stephenson, Kiley, Osborn, Kiley, Harker Rogers, Michael & Certain, Marion, for Miles W. Donaldson and Marion Family Practice, Inc.

BUCHANAN, Judge.

### CASE SUMMARY

Counter-plaintiff-appellant, the Estate of Cloyd Payne, (Estate) appeals from the entry of summary judgment in favor of the counter-defendants-appellees Miles W. Donaldson, M.D. (Dr. Donaldson), Marion General Hospital, Inc. (Hospital) and Marion Family Practice, Inc. (Practice), claiming the trial court erred when it determined there was no genuine issue of material fact.

We reverse in part and affirm in part.

### FACTS

The facts most favorable to the non-moving party (the Estate) reveal that Cloyd Payne (Payne) was admitted to the Hospital on June 6, 1983. Payne was suffering from a variety of maladies, including malnutrition, uremia, hypertensive cardiovascular disease, chronic obstructive lung disease, non-union of a previously fractured left humerus, and congenital levoscoliosis of the lumbar spine. Payne was a 65–year–old alcoholic who had allowed his condition to deteriorate to the point he required hospitalization.

Throughout his stay in the Hospital, Payne was subjected to various tests, which confirmed the admitting diagnosis of malnutrition and uremia. By June 10 his condition was deteriorating. He ate poorly and his respirations became labored. On the morning of June 11, Dr. Donaldson examined Payne but made no modifications in Payne's treatment. Payne ate poorly and was visited by family. At approximately 7:00 p.m., Payne's condition worsened as his temperature rose and his respi-

rations became more frequent and labored. Payne appeared to be awake and alert.

At approximately 9:25 p.m., Payne became congested and mucus was aspirated from his lungs. Shortly thereafter, the nurses attempted to reach Payne's nephew, but were unable to contact him. The nurses did contact Payne's sister and she arrived at the Hospital a short time later. The nurses also contacted Dr. Donaldson and related Payne's condition. Dr. Donaldson then ordered some minor adjustments in Payne's treatment.

After observing Payne for several minutes, his sister informed the nurse she did not want Payne resuscitated if he began to die. The nurse contacted Dr. Donaldson and informed him of Payne's condition and of his sister's request. After consulting with the nurse and talking to Payne's sister, Dr. Donaldson then authorized the entry of a "no code" on Payne's chart, after verifying his order with another nurse pursuant to the Hospital's policy. A "no code" is a designation on a patient's chart that no cardiopulmonary resuscitation is to be given in the event the patient begins to expire. The "no code" was entered by the nurse attending Payne, and no efforts to give Payne cardio-pulmonary resuscitation were attempted.

Supportive care was continued, including the suctioning of mucus from Payne's lungs. Occasionally, Payne was awake and alert, and he made eye contact with the nurses attending him. Payne was conscious and capable of communicating with the nurses until moments before his death. His condition continued to worsen, and at 12:55 a.m. on June 12, 1983, Payne died, and no cardio-pulmonary resuscitation was attempted.

Dr. Donaldson later sued the Estate for compensation, and the Estate counter-claimed, alleging Dr. Donaldson committed malpractice when he issued the "no code." The counter-claim averred that Dr. Donaldson was acting as an agent of the Practice, and joined the Practice as a party. The counter-claim also included a claim of negligence against the Hospital for failing to

provide the proper procedural safeguards when doctors issue "no codes." Dr. Donaldson, the Practice and the Hospital moved for summary judgment and introduced the medical review panel's opinion, issued in accordance with the requirements of the medical malpractice law, which determined the defendants were not negligent. The motions were granted and summary judgment was entered in favor of Dr. Donaldson, the Practice and the Hospital.

## ISSUES

1. Whether the trial court erred when it entered summary judgment in favor of Dr. Donaldson and the Practice?
2. Whether the trial court erred when it entered summary judgment in favor of the Hospital?

## DECISION

ISSUE ONE—Did the trial court err when it determined there was no issue of material fact and that Dr. Donaldson and the Practice were entitled to judgment as a matter of law?

PARTIES' CONTENTIONS—The Estate claims that genuine issues of material fact exist as to whether Payne was competent and terminally ill, and therefore summary judgment was inappropriate. Dr. Donaldson and the Practice respond that the Estate's failure to produce any expert opinion in support of its claim is fatal and therefore summary judgment was correctly granted.

CONCLUSION—The trial court erred when it entered summary judgment in favor of Dr. Donaldson and the Practice.

■ .This is a case of first impression, in which a doctor is sought to be held liable for issuing a "do not resuscitate" order, commonly referred to as a "no code." While numerous courts have considered similar issues, such as a patient's right to refuse medical treatment and the consent

needed to effectuate that right for incompetent patients, no court has considered the physician's liability after having entered a "no code." [1] *See Rasmussen v. Fleming* (1987), 154 Ariz. 207, 741 P.2d 674; *Foody v. Manchester Memorial Hosp.* (1984), 40 Conn.Supp. 127, 482 A.2d 713; *Severns v. Wilmington Medical Center* (1980), Del., 425 A.2d 156; *Brophy v. New England Sinai Hosp., Inc.* (1986), 398 Mass. 417, 497 N.E.2d 626; *Custody of a Minor* (1981), 385 Mass. 697, 434 N.E.2d 601; *Matter of Spring* (1980), 380 Mass. 629, 405 N.E.2d 115; *Superintendent of Belchertown State School v. Saikewicz* (1977), 373 Mass. 728, 370 N.E.2d 417; *Matter of Dinnnerstein* (1978), 6 Mass.App. 466, 380 N.E.2d 134; *Matter of Conroy* (1985), 98 N.J. 321, 486 A.2d 1209; *In Re Quinlan* (1976), 70 N.J. 10, 355 A.2d 647, *Matter of Westchester Co. Medical Center* (1988), 72 N.Y.2d 517, 534 N.Y.S.2d 886, 531 N.E.2d 607; *Matter of Storar* and *Matter of Eichner* (1981), 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64; *Matter of Colyer* (1983), 99 Wash.2d 114, 660 P.2d 738.

Our focus is different. The Estate's claim is that Payne was competent at the time the "no code" was issued and that Dr. Donaldson failed to obtain Payne's informed consent before he issued the "no code." The Estate appeals from the grant of a motion for summary judgment in favor of Dr. Donaldson and the Practice.

In reviewing a grant of summary judgment, this court stands in the place of the trial court and considers the same issues and follows the same process as the trial court. *Burke v. Capello* (1988), Ind., 520 N.E.2d 439; *Madison County Bank & Trust Co. v. Kreegar* (1987), Ind., 514 N.E.2d 279. We must determine the probative value of each piece of evidence without weighing it, considering the facts in the light most favorable to the nonmoving party, and summary judgment will be appropriate only if there is no genuine issue of material fact and the moving party is enti-

---

**1.** We are aware that the plaintiff in *Strickland v. Deaconess Hospital* (1987), 47 Wash.App. 262, 735 P.2d 74, brought suit against his physician for issuing a "no-code" while he was under the doctor's care, but, after the plaintiff died during the pendency of the action, the appellate court determined that the cause of action did not survive the plaintiff's death and therefore did not reach the merits of the plaintiff's claim.

tled to judgment as a matter of law. *Burke, supra; Kreegar, supra.*

A trial court's belief that the nonmovant will be unsuccessful at trial is not grounds for summary judgment. *Newhouse v. Farmers Nat'l Bank* (1989), Ind.App., 532 N.E.2d 26. A hearing on summary judgment is not an abbreviated trial, and summary judgment is generally inappropriate in claims based on negligence. *Jackson v. Warrum* (1989), Ind.App., 535 N.E.2d 1207; *Rediehs Express, Inc. v. Maple* (1986), Ind. App., 491 N.E.2d 1006, *cert. denied* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762.

The Estate's claim against Dr. Donaldson and the Practice is prefaced on the doctrine of informed consent and is considered as based on negligence. *Ellis v. Smith* (1988), Ind.App., 528 N.E.2d 826; *Kranda v. Houser–Norborg Medical Corp.* (1981), Ind.App., 419 N.E.2d 1024, *appeal dismissed* 459 U.S. 802, 103 S.Ct. 23, 74 L.Ed.2d 39; *Searcy v. Manganhas* (1981), Ind.App., 415 N.E.2d 142, *trans. denied; Revord v. Russell* (1980), Ind.App., 401 N.E.2d 763.[2]

In Indiana, the tort of medical malpractice has the same elements of other negligence torts. The elements are: (1) a duty on the part of the defendant in relation to the plaintiff; (2) a failure on the part of the defendant to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure. *Burke, supra.*

The duty owed to Payne by Dr. Donaldson is well established as a matter of law. A physician has the duty to make reasonable disclosure of material facts relevant to the care of a patient. *Revord, supra; Joy v. Chau* (1978), 177 Ind.App. 29, 377 N.E.2d 670, *trans. denied.* The patient's right of self-determination is the *sine qua non* of the physician's duty to obtain informed consent. As Justice (then Judge) Cardozo said: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body...." *Schloendorff v. Society of New York Hospital* (1914), 211 N.Y. 125, 129, 105 N.E. 92, 93. *See Canterbury v. Spence* (C.A.D.C. 1972), 464 F.2d 772.

Dr. Donaldson's first response is that Payne was an incompetent, terminally ill patient, and therefore he owed Payne no duty to obtain his consent for the entering of the "no-code," and that his sister's consent was sufficient. *Appellee's Brief* at 27.

Whether Payne was competent and terminally ill, however, are questions of fact. An examination of the record reveals that genuine issues of fact exists as to whether Payne was competent and terminally ill, precluding the entry of summary judgment in favor of Dr. Donaldson and the Practice.

There is evidence in the depositions of the nurses who attended Payne during the last day of his life from which a jury could conclude Payne was conscious, alert, and able to communicate when the "no code" was entered, and that he remained competent until shortly before his death.

Shirley Lyons, a licensed practical nurse who attended Payne in the morning and early afternoon on the day of his death, testified as follows:

"Q Did you have occasion during his confinement to speak with him at all?

---

**2.** Throughout its brief, the Estate describes its action as one in intentional tort. However, the character of an action is determined by its substance, not its caption or formal denomination. *McQueen v. State* (1979), 272 Ind. 229, 396 N.E.2d 903; *English Coal Co. v. Durcholz* (1981), Ind.App., 422 N.E.2d 302, *trans. denied.* The Estate's claim provided:

"The doctor, and the corporation for which he was acting, wrongfully and intentionally committed the following acts and/or omissions, to wit:

A. Issued a 'no code' order without proper authority, when he should have foreseen that such order would result in the death of CLOYD A. PAYNE.

B. Failed to timely notify the nephew of the decision to enter a 'no code' order.

C. Abandoned the care and treatment of the patient.

D. Failed to secure the proper consent for executing a 'no code' order."

*Record* at 29.

While denominated as an intentional tort, the Estate's basic claim against Dr. Donaldson is that he acted without Payne's informed consent, a claim of negligence not intentional tort.

A Yes.

Q What would the nature of your speech have been?

A As to how he felt and what I could do for him to assist him.

Q Do you recall whether or not he was capable of verbal response?

A Yes.

Q I assume that means you can recall, will you tell me whether or not he was verbal in his responses?

A I did not have a lengthy conversation with him.

Q But he did speak to you?

A Yes.

Q Did he speak in words or phrases that you could understand?

A Yes.

Q Did his answers appear to be responsive to your questions?

A Yes.

Q Did he appear capable of communicating meaningful thoughts to you?

A Meaning what?

Q Did he give you the information that you sought in your questions?

A Yes.

Q Did you respond on the basis of his answers?

A Yes.

Q And care for him in response to his own expressions?

A Yes.

Q Would it be fair to say that you gave credence to his answers?

A I don't understand.

Q You considered them in the course of your conduct as a licensed practical nurse?

A Yes.

Q Took what he said at face value?

A Yes.

. . . . .

Q Do you recall whether on that day, the 11th of June, 1983, you addressed him in conversation?

A No.

Q You don't recall?

A You said on that date? I recall, as I said before, talking to him and answering questions as far as what I could do for him but not in a long conversation.

Q Would the brief exchanges that you have just described taken place on the 11th?

A Yes."

*Record* at 158–62.

Edna Cardwell, a registered nurse who received Dr. Donaldson's order issuing the "no code," attended Payne during the afternoon and evening on the day he died. She testified:

"Q Do you have any reason to suspect that on the 11th of June, 1983, Mr. Payne was unable to speak?

A Well, it would be the same as he would respond to conversation. If you would talk to him he would look at your and appeared to understand but he verbally did not respond to me.

Q Do you have any reason to suspect that he was not capable of responding verbally?

A How do you mean not capable?

Q Not physically able to speak words?

A He was quite short of breath but I would not say that he wasn't capable.

Q *I believe in your prior answer you indicated that on the 11th of June, 1983, he appeared to understand what was being said to him, is that what you said?*

A *Yes.* Because he looked up at you, when you would speak to him he would look at you. He did not respond to me but you would know that he could hear you.

Q Is there a method that nurses in general or you, in particular, use to communicate with patients who are in that type of condition? Do you ask yes or no questions?

A Yes. Sometimes we ask a patient and they shake their head.

Q Is there sometimes some signal that you devise, moving a finger or blinking an eye for affirmative or negative answers?

A Well, that always don't hold true, blinking an eye, everyone blinks an eye

so you aren't positive whether they can understand you or not.

Q But are there methods that are utilized by nurses to communicate with patients who may have difficulty in verbal communication?

A I really don't understand what you mean.

Q *There are methods that you can use to communicate with a person who has a mental faculty but is unable to speak?*

A *Yes.*

Q *Did there come a time on the 11th of June where in your opinion Mr. Payne lost the ability to communicate entirely?*

A *No, not on my tour of duty.*

Q Which would have been ending at 11:00?

A Yes.

Q Is there anything in your notes to indicate that Mr. Payne was other than conscious during your shift on the 11th?

A Well, I've noted at 7:00 p.m., 'responds when spoken to', which would be by expression of his eyes or movement of his head.

Q You have said, Mrs. Cardwell, that you as charge nurse would make note of any significant change in condition. Would that hold true of the loss of consciousness? Would you as charge nurse normally make an entry when a patient losses [sic] his ability to comprehend?

A Yes.

Q And there is no such entry in Mr. Payne's case?

A No.

Q *So is it fair to asume that to the end of your shift he maintained consciousness?*

A *Yes.*

Q And the last time that he actually responded to you was 7:00, did you say?

A That's the first entry I made that p.m.

Q *And it was never reported to you by any of your nursing staff that Mr.* *Payne had lost consciousness at any time during the night?*

A *No."*

*Record* at 194–96 (emphasis supplied).

Bonnie Jean Cunningham, a licensed practical nurse who attended Payne during the last hours of his life, testified:

"Q *Do you have reason to believe that he was aware of your presence?*

A *Yes.*

Q Do you have reason to believe that he was aware of his condition and surroundings and where he was?

A In my mind I thought so.

Q In your mind was he oriented as to time and place?

A I doubt that he was oriented as to the time.

Q In your impression did he know that he was at Marion General Hospital?

A I would think so.

Q And that you were nurses on the staff?

A Yes.

Q And that you were treating him for a medical condition of some sort?

A Yes.

Q Do you have reason to believe he was aware of the presence of his sister?

A Yes.

Q Were you making any effort to keep him informed of what you were doing or was it patently obvious what you were doing?

A I guess it was patently obvious what we were doing. We were working very hard to keep him comfortable, suctioning him, trying to keep the oxygen as much as possible. His skin color was a little dusky looking. He was not getting enough oxygen to keep himself going. That's why we suctioned so frequently.

Q Do you know or do the records indicate to you when Mr. Payne died?

A 12:55.

Q That would be the end of this hour that we are discussing?

A Yes.

Q *Was there a point prior to his death that you feel he lost consciousness?*

A *Maybe right before 12:55.* How do you describe it. As he filled up more we suctioned more but we can't possible (sic) go that far down, with this dark blood stuff coming up and I would say probably—I don't know an exact time.

Q Would it have been within minutes of his death?

A Yes.

Q Prior to that period of minutes before his death, was his condition as you have previously described it in our conversation today?

A Increasingly serious as the hour went on.

Q *But it would have been within moments of his death that he was unable to, in your opinion, comprehend his condition, what was happening to him?*

A *True.*

Q Mr. Payne, at the time that we are discussing, the hour between 12:00 midnight and 12:55 on the 12th of June, 1983, was what is referred to as a no code, is that correct?

A Yes.

.    .    .    .    .

Q In situations where patients are weak physically or for one reason or another unable to communicate in words, do members of your profession devise ways of communicating and answering the questions with the movement of a body part?

A I think eye contact has a lot to do with it.

Q *In your opinion was this method of communication possible with Mr. Payne during the hours of 11:00 p.m. on the 11th to shortly before he died?*

A *Yes.*

Q *Do you feel that he would have had the capacity to hear and understand what you were saying to him?*

A *Yes, part of the time.*

Q Do you feel that he would have had the ability to process that information and give you a response?

A I don't know about a verbal response.

Q How about eye contact or whatever?

Q His eye contact—yes. He looked into your eyes a lot."

*Record* at 270–76 (emphasis supplied).

This evidence unmistakably establishes a genuine issue of fact exists as to whether Payne was competent when the "no code" was issued. Therefore, viewing the evidence in the light most favorable to the nonmovant, we must conclude Payne was competent when Dr. Donaldson issued the "no code." *See Kreegar, supra.*

As to whether Payne was terminally ill, the Estate points to the fact that in March of 1982, Payne was treated by Dr. Donaldson for precisely the same conditions he was suffering from when he was admitted into the Hospital on June 6, 1983.

Dr. Donaldson's responses to the Estate's interrogatories included the following:

"1. Did you have occasion to treat Cloyd A. Payne during a hospital stay in March of 1982?
RESPONSE: Yes.

2. What were you treating the patient for at that time?
RESPONSE:

*Malnutrition; uremia; hypertensive cardiovascular disease; chronic obstructive lung disease; non-union of old fractured left humerus; and congenital levoscoliosis of the lumbar spine.*

3. Did you have occasion to treat Cloyd A Payne during June of 1983?
RESPONSE: Yes.

4. If so, state:

a. What did you determine the patient was suffering from during June of 1983?

b. What services did you render to the patient during June of 1983?
RESPONSE:

a. *Malnutrition; uremia; hypertensive cardiovascular disease; chronic obstructive lung disease; non-union of*

**1050** ■

*old fractured left humerus; and conge-
nital levoscoliosis of the lumbar spine.*
    b. Supportive treatment."
*Record* at 103 (emphasis supplied).

As Payne had previously survived the identical conditions from which he suffered at the time of his admission in June of 1983, whether Payne was terminally ill cannot be resolved by reference to undisputed facts. Because this evidence has *some* probative value, we must conclude a genuine issue of fact exists as to whether Payne was terminally ill. *Burke, supra; Kreegar, supra.* Because the evidence could support a conclusion that Payne was competent and not terminally ill at the time the "no code" was issued, we cannot accept Dr. Donaldson's and the Practice's claim that no duty to obtain his consent was owed to Payne.

■ In the alternative, Dr. Donaldson and the Practice argue that the Estate's lack of expert medical testimony as to the standard of care required by Dr. Donaldson's relationship with Payne, to rebut the medical review panel's opinion Dr. Donaldson and the Practice were not negligent, is fatal to its cause of action. Therefore, they maintain summary judgment was appropriate. As a general rule, expert medical testimony is required to establish whether the disclosure by the physician is reasonable. However, if the situation is clearly within the realm of laymen's comprehension, expert medical testimony is not required. *Ellis, supra; Searcy, supra; Revord, supra.*

In *Burke,* our supreme court recognized that not every medical malpractice case needs expert medical testimony to survive summary judgment. If a rational trier of fact can conclude that the defendant's actions breached his duty to the plaintiff, summary judgment is inappropriate. *Burke, supra.*

We believe that this is a situation within the realm of the ordinary laymen's comprehension. No disclosure whatsoever was made. Further, the evidence establishes that Dr. Donaldson made *no* effort to determine if Payne was competent. The "no code" was issued over the phone and Dr.

Donaldson had not seen Payne for several hours when he issued the "no code." *Record* at 105. If a jury concludes that Payne was competent at the time the "no code" was issued, it could conclude that the fact Dr. Donaldson made *no* effort to obtain Payne's consent and that he made *no* effort to determine whether Payne was competent was a breach of his duty to obtain Payne's consent. A jury would not weigh a disclosure to determine if it met the requisite standard of care, as is typically the task undertaken by the jury in informed consent cases. *See Ellis, supra; Kranda, supra; Searcy, supra; Revord, supra.*

Whether Payne was damaged by Dr. Donaldson's failure to obtain his informed consent is a question of fact for the jury to determine. The record demonstrates that, had the "no code" not been issued, efforts to resuscitate Payne would have been undertaken, including cardio-pulmonary resuscitation. *Record* at 106. Even Dr. Donaldson and the Practice admit that resuscitation efforts offer *some* chance for the patient to keep body and soul together. *Appellee's Brief* at 30. As a jury could conclude Payne was not terminally ill, it could determine some damage was sustained due to Dr. Donaldson's failure to obtain Payne's informed consent, and therefore summary judgment was inappropriate.

To recapitulate, genuine issues of material fact exist as to whether Payne was competent and as to whether he was terminally ill when Dr. Donaldson issued the "no code." Because of the existence of these issues, the trial court erred by granting summary judgment in favor of Dr. Donaldson and the Practice.

ISSUE TWO—Did the trial court err when it granted summary judgment in favor of the Hospital?

PARTIES' CONTENTIONS—The Estate argues that the Hospital had no written policies concerning the issuance of "no codes" and failed to insure Dr. Donaldson obtained Payne's consent before issuing the "no code." The Hospital replies that

the Estate has failed to establish its conduct fell below the requisite standard of care required by its relationship to Payne. CONCLUSION—Summary judgment was properly entered.

◼ Summary judgment may be appropriate when there is no dispute or conflict regarding a fact which is dispositive of the litigation. *Kreegar, supra.*

The Estate's action against the Hospital is based on the Hospital's negligence in failing to have a written policy concerning "no codes." *Record* at 28. As observed above, one of the elements of a claim of negligence is that the defendant failed to conform its conduct to the requisite standard of care required by the relationship between the plaintiff and the defendant. *Burke, supra.* As the supreme court in *Burke* recognized, ordinarily, triers of fact are unable to rationally apply the standard of care to cases involving a malpractice claim, because of the technical and complicated nature of medical treatment, without the benefit of informative expert opinion on the ultimate question of breach of duty. *Id.*

While there are exceptions, *e.g. Burke, supra; Ciesiolka v. Selby* (1970), 147 Ind. App. 396, 261 N.E.2d 95, *trans. denied,* the general rule applies in most cases. Although we have determined that the Estate's claim against Dr. Donaldson and the Practice qualifies for exceptional treatment, we cannot come to a similar conclusion concerning its claim against the Hospital.

In order to establish that the Hospital's treatment of Payne fell below the standard of care its relationship with Payne required, the Estate must rebut the opinion of the medical review panel which determined the Hospital was not negligent. The Estate presented no evidence whatsoever of policies used by any other hospital, and the Estate has made no cogent argument describing how the Hospital's policies concerning "no codes" were deficient.

The Estate emphasizes that the Hospital has no *written* policy concerning "no codes." It makes no showing that other hospitals use written policies, and the Estate does not demonstrate how the fact the Hospital's policy is unwritten is relevant. There is no evidence in the record from which a jury could reasonably have concluded the Hospital failed to meet its standard of care.

As the Estate failed to show the Hospital's actions fell below the requisite standard of care, we cannot conclude that the trial court erred when it granted summary judgment in favor of the Hospital. *Burke, supra; Marquis v. Battersby* (1982), Ind. App., 443 N.E.2d 1202; *Searcy, supra; Bassett v. Glock* (1977), 174 Ind.App. 439, 368 N.E.2d 18.

The trial court's judgment as to Dr. Donaldson and the Practice is reversed, and in all other respects affirmed.

SHIELDS, P.J., and ROBERTSON, J., concur.