## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 05 2017, 5:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cynthia S. Rose
Arthur R. Baxter, Jr.
Baxter James & Rose LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Robert G. Zeigler
Marilyn A. Young
Erin E. Bowles
Zeigler Cohen & Koch
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Debra K. Ford, Personal Representative of the Estate of Darlene M. Welsh,

*Appellant-Plaintiff,*

v.

Indiana Heart Hospital,

*Appellee-Defendant*

April 5, 2017

Court of Appeals Case No. 49A04-1606-CT-1334

Appeal from the Marion Superior Court

The Honorable James B. Osborn, Judge

Trial Court Cause No. 49D14-1510-CT-037696

**Mathias, Judge.**

[1] Darlene M. Welsh ("Welsh") died while recovering from open heart surgery at the Indiana Heart Hospital ("the Hospital")[1] in Indianapolis. Debra K. Ford ("Ford"), Welsh's daughter and the personal representative of her estate, sued the Hospital for medical negligence. The trial court granted summary judgment in the Hospital's favor. From that grant, Ford now appeals, claiming her designation created a fact issue as to the applicable standard of care and precluded judgment as a matter of law.

[2] We reverse.

## Facts and Procedural Posture

[3] Darlene Welsh was an eighty-two-year-old woman, described with medical objectivity as "quite functional for her age and very active." Appellant's App. p. 59. On May 2, 2011, Welsh received previously scheduled open heart surgery at the Hospital to repair her mitral valve and to bypass a blocked coronary artery.

[4] Once the repair and bypass were completed, the surgeon, Dr. John Storey ("Storey"), placed a single "pacing wire" in Welsh's chest. Pacing wires connect the heart to an artificial pacemaker and may be placed temporarily in the chests of postoperative open heart surgery patients to help regulate ("pace") heart rhythms and blood flow until the heart can function normally on its own. *See id.* p. 90. Storey anchored one end of the pacing wire in Welsh's

---

[1] The Hospital now operates under a different name.

myocardium, the heart muscle, and ran the other end through the sternotomy incision in the left side of Welsh's chest.

[5] By all accounts, the surgery went well. On May 3, 2011, the first day after surgery, Storey noted, "[Welsh]'s doing fine. Cardiac function is fine. Labs okay . . . . We will discontinue her tubes lines and wires . . . ." *Id.* p. 29 (*sic*). Storey could not later say what "wires" referred to here. *Id.* p. 84. In any event, Welsh's pacing wire was not removed on that day. Storey's outlook on May 4, 2011, was similarly optimistic, and Welsh had "no complaints." *Id.* p. 30. On and after May 5, 2011, Storey was on vacation in New York City, and a new doctor supervised Welsh's care in his absence. "[N]o new issues" were reported that day by the new doctor. *Id.* p. 31.

[6] On May 6, 2011, the fourth day after surgery, Welsh was scheduled to go home from the Hospital. Lindsay Cool ("Cool"), a nurse practitioner, had been asked by the new doctor to remove ("pull") the pacing wire from Welsh's chest. The doctor had apparently planned to pull the wire himself but forgot to do so on his rounds earlier that morning. *Id.* p. 73. "There were a few of the nurse practitioners that worked for the cardiologists that were comfortable removing pacemaker wires, but they did not routinely do that. It was up to [surgical nurse practitioners like Cool] on [their] rounds to do that" if a physician was not available. *Id.* p. 74. Cool testified that, when she pulled Welsh's pacing wire, she was not following a written policy, procedure, or protocol, because the Hospital did not have one, nor did the physician group within the Hospital for which Cool worked. *Id.* p. 72.

Welsh was sitting comfortably in a reclining chair in her hospital room as Cool pulled the wire. Cool felt no resistance "whatsoever" as she pulled the wire out from Welsh's myocardium through her chest; if Cool had felt any, she would have stopped. *Id.* p. 73. "That wasn't bad," Welsh said when Cool was finished. *Id.*

About ten minutes later, around 8:35 a.m., Welsh was sitting in bed getting ready to eat breakfast. She suddenly felt unwell and lost consciousness. A "Code Blue" was called and "extensive" emergency resuscitation was attempted by responding Hospital staff — to no avail. *Id.* p. 37. An echocardiogram indicated a "large" pericardial effusion. *Id.* Cardiac tamponade, a potentially fatal compression of the heart by the pressure of the accumulating blood and other fluid around it, *see id.* p. 89, was suspected. This could have been treated surgically, but Welsh was judged "really far too unstable" for immediate surgery. *Id.* p. 37. Over one liter of blood and other fluid was drawn from her chest by aspiration, "but this did not result in any improvement in [Welsh's] clinical status." *Id.* After about fifty minutes, further resuscitative efforts were deemed futile. Welsh was pronounced dead at 9:21 a.m.

Ford, Welsh's daughter and the personal representative of her estate, brought suit, alleging medical negligence. On April 5, 2013, as required by Indiana's Medical Malpractice Act, Ind. Code art. 34-18, Ford first filed her proposed complaint with a medical review panel, *id.* § 8-4, naming the Hospital, Storey, and Cool as proposed defendants. Appellant's App. p. 14. On August 11, 2015,

the panel issued its opinion, here in full: "The evidence does not support the conclusion that the [proposed] Defendants failed to meet the applicable standard of care as charged in the [proposed] complaint." *Id.* p. 17. On October 30, 2015, the panel's opinion notwithstanding, Ford filed her complaint in Marion Superior Court, naming only the Hospital as defendant.

[10] On January 8, 2016, the Hospital moved for summary judgment, designating in support the panel's opinion finding no breach of the standard of care. The Hospital argued that the opinion "demonstrate[d] the absence of a genuine issue of material fact on the elements of breach of the standard of care and proximate causation." *Id.* p. 22. In response, Ford designated excerpts of Welsh's medical records, excerpts of Storey's and Cool's deposition testimony, and the affidavit of Amanda Dillow ("Dillow"), a registered nurse and certified nurse legal consultant ("the Dillow affidavit").

[11] The Dillow affidavit set out Dillow's relevant training and experience. *Id.* p. 77 ¶¶ 2-6. Dillow affirmed that her experience included "developing and educating nursing staff in the care of patients with temporary . . . pacemakers [and] pre-op[erative] and post-op[erative] care according to policies and procedures . . . ." *Id.* ¶ 4. Dillow affirmed further that she was "familiar with the standard of care for . . . removing temporary pacing wires in post-op[erative] open heart [surgery] patients," *id.* ¶ 6, and that she had reviewed Ford's and the Hospital's submissions. *Id.* ¶ 7. Dillow concluded the Hospital "did not meet the standard of care" in Welsh's case. *Id.* ¶ 8. Particularly:

[a]mong other issues, Ms. Cool stated in her deposition that she did not follow a hospital policy and procedure when she removed the pacing wires.

In addition and among other issues, Ms. Cool stated that there was no policy and procedure at the . . . Hospital for the removal of temporary pacing wires in May, 2011.

There are other ways in which the . . . Hospital, through the acts of its employees did not meet the standard of care in these circumstances.

*Id.* ¶¶ 9-11 (*sic passim*) (internal citations and subdivisions omitted).

[12] The trial court heard argument on the Hospital's motion on May 9, 2016, and took it under advisement. On May 11, 2016, the court granted the motion without entering its findings or conclusions.

[13] Ford timely filed notice of appeal on June 9, 2016. The parties join issue on whether the Dillow affidavit was sufficient to create a genuine issue of material fact preclusive of summary judgment. We hold that it was.

## Standard of Review

[14] As a purely legal question, we review de novo the trial court's grant of judgment as a matter of law. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). We will not affirm unless the designated evidence shows there is no genuine issue as to any material fact. *Id.* "A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal quotation and

citation omitted). We draw all reasonable inferences in the non-movant's favor. *Id.* "[A]lthough the [non-movant] has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that she was not improperly denied her day in court." *Id.* (internal quotation and citation omitted).

[15] In contrast to federal practice, an Indiana summary judgment movant may not rely on a non-movant's failure to designate evidence in support of each element of her claim. *Id.* Rather, Indiana practice places the burden on the movant affirmatively to negate — that is, to designate evidence disproving — an element of the non-movant's claim. *Id.* If carried, the burden then shifts to the non-movant to come forward with contrary evidence requiring resolution by a trier of fact. *Id.* Such evidence precludes judgment as a matter of law. This rule reflects our policy of "consciously err[ing] on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Id.* at 1004.

[16] The elements of a medical malpractice claim are three: that defendant healthcare provider owed plaintiff patient a duty; that defendant breached that duty; and that plaintiff's injuries were proximately caused by that breach. *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016). The unanimous opinion of a medical review panel designated by a movant ordinarily suffices to shift the burden to the non-movant on the elements to which the opinion speaks, requiring the non-movant to rebut the opinion with her own expert medical testimony on those elements. *Id.* at 1187-88. If the non-movant's expert

designation contradicts the panel's opinion, her case is "by definition inappropriate for summary judgment, because weighing evidence is a matter for trial . . . ." *Id.* at 1088 (internal citation and quotation omitted).

# Discussion and Decision

[17] Ford argues that the Dillow affidavit was legally and factually sufficient under the applicable standard to create a genuine fact issue as to the existence and breach of the standard of care. The Hospital raises several arguments in support of the judgment below, but only one is properly presented for our review: that the Dillow affidavit was legally and factually insufficient to create a genuine fact issue. The rest are challenges to the admissibility of the affidavit which the Hospital did not raise below and therefore waived.[2] *Paramo v. Edwards*, 563

---

[2] The Hospital argues that Dillow was incompetent to give expert testimony as to the existence or breach of the standard of care by the Hospital or Cool, and that the medical records designated with the affidavit were not certified as required by Indiana Trial Rule 56(E). These challenges to admissibility were not raised in the trial court. Waiver notwithstanding, we note the following.

As to the first argument, it presents precisely the sort of question that cannot be intelligently decided without the record developed by contemporaneous objection. While it is true that, under Indiana Evidence Rule 702, we have held that nurses are generally incompetent to give expert testimony on the standard of care for physicians or on medical causation, *Long v. Methodist Hosp. of Ind., Inc.*, 699 N.E.2d 1164, 1168-69 (Ind. Ct. App. 1998), we have also expressly declined to propound "a blanket rule that nurses cannot qualify as expert witnesses" with respect to duty and breach by any and every nonphysician health care provider, *Curts v. Miller's Health Systems, Inc.*, 972 N.E.2d 966, 971 (Ind. Ct. App. 2012), such as nursing homes, *id.*, hospitals, or nurse practitioners. Indeed, it seems reasonable to expect that a nurse would be qualified to give expert testimony on whether nurses, whether registered nurses like Dillow or nurse practitioners like Cool, should be governed by written protocols when extracting metal wires from beating hearts. We could not say whether a ruling to this effect, or its contrary, would constitute abuse of the trial court's "broad discretion," *Ford v. Jawaid*, 52 N.E.3d 874, 877 (Ind. Ct. App. 2016), in the absence of an objection, and thus a record, below.

As to the second argument, even if the medical records had been objected to and struck, as the Hospital itself concedes, the Dillow affidavit "did not refer to any specific facts found in [them] . . . ." Appellee's Br. p. 13. Dillow referred to them only to say she had reviewed them, as required of medical expert affiants in this context, *Jordan v. Deery*, 609 N.E.2d 1104, 1110 (Ind. 1993), and Ford apparently designated them only in an attempt to comply with T.R. 56(E), requiring "[s]worn or certified copies . . . of all papers . . . referred to in an affidavit . . . ." In other words, the records were and are not part of Ford's substantive argument on

N.E.2d 595, 600 (Ind. 1990) ("A complaining party has a duty to direct the trial court's attention to a defective affidavit, and failure to raise an objection constitutes waiver. We decline to excuse the lack of timely objection despite the defendants' argument that a reviewing court is *bound* to affirm a trial court's grant of summary judgment if sustainable on any theory or basis found in the record." (original emphasis, internal citations omitted)); *Dunaway v. Allstate Ins. Co.*, 813 N.E.2d 376, 387 (Ind. Ct. App. 2004) ("Issues not raised before the trial court on summary judgment cannot be argued for the first time on appeal and are waived."); *Long v. Methodist Hosp. of Ind., Inc.*, 699 N.E.2d 1164, 1166 (Ind. Ct. App. 1998) ("[A]ny objection raised to an affidavit after a ruling on summary judgment is . . . waived as untimely."); *Bankmark of Fla., Inc. v. Star Fin. Card Servs., Inc.*, 679 N.E.2d 973, 980 (Ind. Ct. App. 1997) ("[A] party complaining that an affidavit is defective has a duty to direct this complaint to the trial court, and the failure to do so constitutes waiver."). We therefore confine our review to the question of the Dillow affidavit's sufficiency.

[18] In medical malpractice cases, the otherwise admissible affidavit of a medical expert designated by a non-movant, controverting the movant's position as to whether the applicable standard of care has been satisfied, is ordinarily sufficient to preclude summary judgment in the movant's favor. *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1190 (Ind. 2016) (reversing grant of summary

---

summary judgment. *See Mills v. Berrios*, 851 N.E.2d 1066, 1072 (Ind. Ct. App. 2006) ("[W]e conclude that [plaintiff's expert's] affidavit [relying on plaintiff's medical records] is not legally insufficient merely because [plaintiff's] medical records were not attached or designated.").

judgment). "[E]xpert opinions which conflict on ultimate issues necessarily defeat summary judgment." *Id.* A different result is required only in the exceptional case, not presented here, where a party-physician affiant, unsupported by other evidence, attempts to bootstrap his naked litigation position into admissible evidence. *Scripture v. Roberts*, 51 N.E.3d 248 (Ind. Ct. App. 2016) (affirming grant of summary judgment).[3]

In *Chi Yun Ho v. Frye*, 880 N.E.2d 1192 (Ind. 2008) (affirming denial of summary judgment), our supreme court considered "whether conflicting opinions [in medical malpractice cases] regarding whether a physician met the applicable standard of care, *in the absence of facts supporting such opinions*, operate to create a genuine issue of material fact precluding summary judgment." *Id.* at 1201 (emphasis added). It was held that such conflicting opinions preclude summary judgment. *Id.* There, defendant physician resisted plaintiff patient's motion for summary judgment by designating one affidavit, his own, and parts of the deposition testimony of a second physician, not a party to the suit, who treated the plaintiff after the defendant. *Id.* at 1200. The designation was "extremely sparse in factual content," *id.*, did not set out in terms what the

---

[3] The Hospital relies heavily on *Scripture*. There, we expressly reserved the question "whether a defendant doctor's own affidavit standing alone is sufficient to defeat summary judgment." *Id.* at 251 n.2. We did not discuss *Chi Yun Ho v. Frye*, 880 N.E.2d 1192 (Ind. 2008), discussed here *infra*. Rather, in *Scripture*, we held that defendant physicians' unsupported and conclusory affidavits did not defeat summary judgment in the plaintiffs' favor, because the affidavits "cited no facts that would support that they met the standard of care or that their conduct did not cause the [plaintiffs'] damages." *Id.* at 254. To the extent that *Scripture* and *Chi Yun Ho* conflict, of course the former must yield to the latter. However, we do not think they do conflict, if *Scripture* is understood to stand for the proposition recited here and contemplated (though reserved) there.

applicable standard of care was, *see id.*, but affirmed that the defendant had met it. *Id.*

[20] In *Chi Yun Ho*, our supreme court held that, together, the affidavit and deposition extract sufficed to preclude summary judgment in the plaintiff's favor because they created a genuine issue of material fact. *Id.* at 1201. "Medical negligence is . . . not generally a conclusion that may be reached by a jury without . . . an expert opinion [as to the applicable standard of care] among the evidence presented. Such expert opinion takes on the character of an evidentiary fact in medical malpractice cases." *Id.* In such cases, therefore, "an opinion on the ultimate fact of whether a defendant physician's conduct fell below the applicable standard of care may be seen as qualitatively different," *id.*, from cases where mere "speculation, not evidence" is designated by a defendant in an attempt to furnish nonnegligent explanations for his conduct. *Cox v. Paul*, 828 N.E.2d 907, 913 (Ind. 2005).

[21] "Of course, [such conclusory] opinions would be greatly enhanced by detailing the factual circumstances upon which they were based. Numerous cases, however, have treated such detailing as affecting the weight and credibility to be given to the opinion [by the trier of fact] rather than its admissibility" and sufficiency to defeat a motion for summary judgment. *Jordan v. Deery*, 609 N.E.2d 1104, 1111 (Ind. 1993) ("reluctantly" reversing summary judgment) (quoting *Kopec v. Memorial Hosp. of South Bend*, 557 N.E.2d 1367 (Ind. Ct. App. 1990), *trans. denied*). Our supreme court has emphasized that the question on summary judgment is not whether the evidence would support a *verdict* in favor

of the non-moving party, but whether "a conflict of evidence *may* exist" on a material issue. *Siner*, 51 N.E.3d at 1189 (original emphasis) (quoting *Purcell v. Old Nat'l Bank*, 972 N.E.2d 835, 841 (Ind. 2012)).

[22] *Chi Yun Ho* is to be further distinguished from cases in which an affiant physician affirmed merely that "*he* would have treated [the patient] differently, not that [defendant physician]'s treatment fell below the applicable standard [of care]." *Oelling v. Rao*, 593 N.E.2d 189, 190–91 (Ind. 1992) (original emphasis). Such a designation is insufficient as a matter of law to preclude summary judgment because it does not address the applicable legal standard: whether the patient's treatment fell below the applicable standard of care. Thus, "[t]o refute the defendants' evidence, the affidavit needed to set out the applicable standard of care and a statement that the treatment in question fell below that standard." *Id.* at 190.

[23] Under this approach, for example, Indiana appellate courts have deemed the following sufficient to preclude summary judgment: a medical review panel opinion that defendants' "conduct may have been a factor of some resultant damages," *Siner*, 51 N.E.3d at 1189; a defendant's affidavit that he "took all the necessary and reasonable steps, in accordance with the standard of care, to remove all sponges from [the plaintiff's] abdomen,"[4] *Chi Yun Ho*, 880 N.E.2d at

---

[4] "The fact that the nursing staff made and recorded sponge counts showing all sponges accounted for and reported that fact to [defendant physician] does not preclude [his] liability [because] a surgeon may not escape his responsibility to remove sponges used during the surgery simply by delegating responsibility for tracking surgical sponges to attending nurses." *Chi Yun Ho*, 880 N.E.2d at 1200. That fact, averred in the

1200; a plaintiff's expert's affidavit that "set forth her conclusion that the defendants violated the standard of care in their treatment of the child and that such treatment caused the complained-of injuries" without being "informative in any way as to the nature of the deviation," *Deery*, 609 N.E.2d at 1111; and a plaintiff's expert's affidavit that "he is familiar with the standard of care of physicians engaged in abdominal surgery in [the county], he reviewed the relevant medical records of [the plaintiff] and the depositions, and he was of the opinion that the care rendered to [the plaintiff] by all Defendants was below the applicable standard of care and was causative in [the plaintiff's] death." *Randolph Cnty. Hosp. v. Livingston*, 650 N.E.2d 1215, 1219 (Ind. Ct. App. 1995).

[24] Here, resolving, as we must, all reasonable inferences and all ambiguities in Ford's favor, we conclude that a fair reading of the Dillow affidavit reveals that Dillow first stated her experience included "developing and educating nursing staff in the care of patients with temporary . . . pacemakers [and] pre-op[erative] and post-op[erative] care according to policies and procedures," Appellant's App. p. 77 ¶ 4, and that she was "familiar with the standard of care for this procedure of removing temporary pacing wires in post-op[erative] open heart patients." *Id.* ¶ 6. She then stated the Hospital fell short of the standard of care in Welsh's case. *Id.* ¶ 8. "Among other issues," she then identified two particular ways in which the Hospital did so: by allowing Cool to pull Welsh's

defendant's affidavit, therefore was judged irrelevant to the question of whether the affidavit operated to create a genuine fact issue as to duty and breach. Compare this with Appellee's Brief p. 14 (asserting that defendant in *Chi Yun Ho* "*did provide facts* and indeed established the standard of care . . . .").

pacing wire unregulated by a "hospital policy and procedure," *id.* ¶ 9, and by failing to establish such a "policy and procedure" with respect to "removal of temporary pacing wires" to begin with. *Id.* ¶ 10.

[25] In sum, Dillow affirmed that, given her training and experience as a registered nurse who educates other nurses in the care of postoperative open heart surgery patients according to protocol, and given her familiarity with the standards for pacing wire removal, the Hospital fell short of the standard of care when it allowed a nurse practitioner to remove a pacing wire unregulated by written protocols, and when the Hospital failed to establish such protocols at all. While the affidavit expressly stated only the minor premise and the conclusion of the argument, the implied major premise, that the standard of care requires regulation by written protocols of pacing wire removal by nurse practitioners, is only one reasonable inferential step away. We believe this was sufficient to create a genuine fact issue requiring resolution by the trier of fact.

[26] The Hospital cites our decision in *Payne v. Marion General Hospital*, 549 N.E.2d 1043 (Ind. Ct. App. 1990), *trans. denied*, for the proposition that a plaintiff alleging a hospital's negligent failure to establish a written policy must produce evidence of "policies used by [another] hospital" or evidence that "other hospitals use written policies" to rebut a medical review panel's conclusion of no breach and survive summary judgment. *Id.* at 1051. However, *Payne* established no such rule. There, defendant physician entered a do-not-resuscitate order without any attempt to obtain plaintiff patient's informed consent. We excused the plaintiff from the ordinary requirement to present

expert evidence as to defendant physician's alleged breach of the standard of care because the plaintiff's situation was "within the realm of the ordinary laym[a]n's comprehension." *Id.* at 1050. No expert testimony was needed to help a jury decide whether the plaintiff would have been physically and mentally competent to give his consent had defendant physician sought it. *Id.*

However, in *Payne*, we also declined to excuse the plaintiff's complete lack of expert testimony as to his claim against defendant hospital for failure to have a written policy regulating a physician's entry of do-not-resuscitate orders. In other words, we held only that the plaintiff's claim against the hospital was subject to the ordinary requirements of proof in medical negligence cases. *Id.* at 1051 ("Although we have determined that [plaintiff's] claim against [defendant physicians] qualifies for exceptional treatment, we cannot come to a similar conclusion concerning [plaintiff's] claim against the Hospital."). Here, in contrast, we have concluded that the Dillow affidavit satisfied those requirements.

It is, of course, irrelevant to the questions of duty and breach whether a Hospital policy regulating the removal of pacing wires by nurse practitioners would have caused Cool to proceed differently in pulling Welsh's wire, and whether that different procedure would have prevented Welsh's death. Those questions go to causation, as to which the Hospital designated no evidence below. It was therefore never Ford's burden to designate evidence on causation in rebuttal. *Bunch v. Tiwari*, 711 N.E.2d 844, 850-51 (Ind. Ct. App. 1999) ("When the movant on summary judgment relies only upon the opinion of the

medical review panel which found no breach of the standard of care but was silent as to the other elements . . . , the plaintiff non-movant is only obligated to present expert testimony on the standard of care element . . . .") (quoting *Randolph Cnty. Hosp.*, 650 N.E.2d at 1219).

Judge Baker's dissent on this point rests on the assumption that, as a matter of law, there is *no* factual situation in which Hospital policy could have prevented Welsh's death, so long as Cool otherwise (that is, other than in failing to follow Hospital policy) met the nurse practitioner's standard of care for pulling pacing wires. This inference is a reasonable one, and may in fact be true. However, it is also an inference drawn in the movant's favor, and the movant has not shown it to be true and did not argue the point in these terms. It cannot, therefore, afford the Hospital a basis for relief at the summary judgment stage.

## Conclusion

Because the Dillow affidavit sufficiently stated that the Hospital breached the standard of care in Welsh's case, it created a genuine issue of material fact as to duty and breach, and the trial court's grant of summary judgment was inappropriate. We therefore reverse that grant and remand for further proceedings.

Reversed.

Pyle, J., concurs.

Baker, J., dissents with separate opinion.

Debra K. Ford, Personal
Representative of the Estate of
Darlene M. Welsh,

*Appellant-Plaintiff,*

v.

Indiana Heart Hospital,

*Appellee-Defendant*

Court of Appeals Case No.
49A04-1606-CT-1334

**Baker, Judge, dissenting.**

[32] Because I believe that the majority's analysis is missing the forest for the trees, I respectfully dissent.

[33] Ford is attempting to recover damages under two theories. Under the first theory, Ford alleges that the manner in which Nurse Cool pulled the pacing wire from Welsh's chest fell below the standard of care, which resulted in Welsh's death. Under the second theory, Ford alleges that the Hospital's failure to have a policy and procedure for the removal of pacing wires fell below the standard of care. But in order to recover under the second theory, Ford will still need to show, ultimately, that the Hospital's failure to have such a policy and procedure led to Cool pulling the pacing wire in a substandard way, which resulted in Welsh's death. In other words, under *either* theory, Ford will need to

prove that Cool pulled the pacing wire incorrectly. If Cool did everything she was supposed to do despite the absence of a policy, if she did not remove the pacing wire in a substandard manner, then the existence or absence of policies and procedures regarding pacing wires would be inconsequential and irrelevant.

[34] The Hospital designated evidence—the unanimous opinion of the medical review panel—that Cool did not pull the wire in a substandard manner. The burden then shifted to Ford to rebut that opinion with her own expert testimony. *Siner*, 51 N.E.3d at 1187-88.

[35] In rebuttal, Ford designated the affidavit of Registered Nurse Amanda Dillow. As the majority notes, Dillow has extensive experience in providing cardiovascular care, removing pacing wires, and educating nursing staff to do the same. After reviewing the relevant depositions, medical records, and documentation, Dillow did *not* testify that Cool pulled the wire in a substandard manner. Instead, Dillow testified only that the Hospital did not meet the standard of care because it did not have a "policy and procedure . . . for the removal of temporary pacing wires . . . ." Appellant's App. p. 78. In short, the Hospital designated evidence disproving Ford's allegation that the manner in which Cool removed the pacing wire fell below the standard of care, and Ford failed to rebut that evidence.

[36] This clearly precludes Ford, as a matter of law, from recovering under her first theory. But the majority believes that Dillow's affidavit saves Ford's second theory from summary judgment. I cannot agree.

[37] Dillow's affidavit certainly creates a question of fact of whether the Hospital should have had a policy and procedure for pulling pacing wires. But the majority is wrong to write that "the Hospital designated no evidence below" regarding causation on this issue. Slip Op. at *15. Under the second theory, Ford will need to show that the Hospital's lack of policy caused Cool to pull the wire incorrectly, or that the lack of policy otherwise led Cool or the Hospital to act in a manner that fell below the standard of care, leading to Welsh's death. The Hospital's designated evidence goes precisely to this issue: the unanimous, unrebutted opinion of the medical review panel is that Cool did not pull the wire incorrectly. More than an inference, this is evidence designated by the summary judgment movant that shows that there is no causal link between the lack of a policy, the care that was provided, and Welsh's death.

[38] Because the Hospital designated evidence showing that there is no causal link, the burden then shifted to Ford to designate evidence showing that there *was* a causal link. Again, Ford's expert witness reviewed the entire case and declined to say that the lack of policy led to the provision of substandard care. Because the Hospital's evidence was unrebutted, there is no genuinely disputed fact that the Hospital's lack of a policy did not cause Welsh's death. Without proof of causation, Ford cannot recover. Even under the second theory, the Hospital is entitled to judgment as a matter of law.

[39] For the foregoing reasons, I would affirm the trial court's grant of summary judgment. I respectfully dissent.